IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION
IN ADMIRALTY
CASE NO.: 2:22-cv-00346-SPC-KCD

MARINE TOWING & SALVAGE OF S.W. FL., INC.

Plaintiff,

v.

ONE 66' 2019 SABRE DIRIGO, known as
the M/V *TERRY LEAH*, (aka M/V WHIRLAWAY)
its engines, tackle, equipment, apparel, appurtenances,
etc., *in rem;* MONTE BRIGGS, *in personam*,
and EYRIE HOLDINGS, LLC, a Florida Limited Liability Company,

Defendants.

_____/

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Defendants the M/V TERRY LEAH and EYRIE HOLDINGS LLC[1]submit

this Proposed Findings of Fact and Conclusions of Law.

This matter was tried before the Court over a three day period.  The Court

having considered the testimony of all witnesses appearing before it reaches the

following findings of fact and conclusions of law:

---

[1] The allegations against Monte Biggs as an individual were disposed of by this Court in its
Order on Summary Judgment DE 77.

## FINDINGS OF FACT

On April 8, 2022, the 66' 2019 SABRE DIRIGO, known as the M/V TERRY LEAH, aka M/V WHIRLAWAY (Vessel) left Tarpon Point Marina, Cape Coral (T2 p. 158 L20-21; p.159 L15.18)[2] for an afternoon cruise 9T2 p.159 L25 – p.160 L1) with Randall Pittman as captain, Monty Biggs (deck hand) and Mary Pittman (passenger). The intended itinerary was to sail south around Estero Island and return to Tarpon Point Marina. (T2 p.160 L2-4).

### People on Board the Terry Leah

The people on board the Vessel were all experienced sailors. Randall Pittman who was at the helm driving the boat on April 8th (T3 p.61 L18-20) sailed his entire life in boats ranging from 12 to 143 feet. He raced sail boats competitively for 40 years across the ocean, sailed in the Great Lakes, East and West Coasts, Mediterranean, England, Galapagos, Australia and New Zealand. He currently owns a variety of boats including a 125 foot yacht. (T2 p.156 L7-21).

Mary Pittman was experienced in competitive sailboat racing in the Pacific Northwest. (T3 p.118 L16-20). She is an experienced boater cruising on powerboats on the East Coast, Pacific Northwest, and Mediterranean. (T3 p.119 L3-9). She and her husband sailed a smaller version of the Terry Leah on a 3000

---

[2] Citations to the Trial Transcript will be designated as "T" followed by the day of trial followed by the page and line numbers. E.g., A cite to day 2 of the trial at p. 3 line 5 to p. 4 line 6 will appear as: "T2 p.3 L5 – p.4 L6".

mile voyage call the Great Loop from Cape Coral across Okeechobee, up the East Coast to the Hudson River, across the Erie Canal, around the Great Lakes, down the Illinois River, down the Mississippi River, to Mobile, Alabama, down the Gulf coast all the way back to Cape Coral. (T2 p.156 L22 to p.157 L6).

Monty Biggs acting as deckhand on the Terry Leah (T3 p.61 L18-20) holds a 200 ton USCG Master's license with sailing and towing endorsements plus STCW. (T3 p.58 L24 to p.59 L2). He is senior captain of Mr. Pittman's 125' Motor Yacht (T3 p.58 L1-3), Mr. Biggs sailed as captain on Yachts on the East Coast, Pacific Northwest, Bahamas, Caribbean. (T3 p. 58 Ll7–19). He is experienced in heavy seas and bad weather. While sailing transatlantic he encountered seas of 20 to 25 feet. (T3 p.59 L18-23).

**The Weather**

It was a good day for cruising according to those on board. (T3 p.119 L12-15). The weather was mostly clear with a 15 MPH wind blowing from the North. The seas were running 1 to 2 feet. (T2 p.177 L10-14; T3 p.5 L17-18; T3 p.60 L22). The fact a Small Craft warning was posted was not a concern. Small craft warnings have no impact on the 66' Terry Leah. (T3 p.61 L3-15). Fifteen mile an hour winds do not present a challenge. (T3 p.5 L24 to p.6 L1). The Pittmans experienced 8 foot waves or higher in the 48' version of the Terry Leah without feeling in peril. (T3 p.29 L1 to p.30 L7).

**The Seas on the trip down to Big Carlos Pass**

The seas on the way South varied between two to two and half feet. (T3 p. 60 L23). Mrs. Pittman described the conditions as a nice day, smooth ride. (T3 p.119 L17-18). There was a little cloud cover. Little bit of waves. Nothing much. The boat had a Seakeeper, so it was a smooth ride. Nothing exciting. (T3 p.119 L 22-25).

**The Sand Bar**

The Vessel ran over a sand bar at Big Carlos Pass. The impact was described as a bump. (T3 p.62 L25 to p.63 L6). Mr. Biggs checked the engine room confirming no water was entering the boat. (T3 p.63 L22 - p. 64 L2).

**Maneuvering the Vessel after Running over the Sand Bar**

After running over the sand bar Mr. Pittman was able to maneuver the boat on the port engine.  (T3 p.63 L10-16; p.103 L3-4). Mr. Pittman appeared to maneuver the boat in different directions. (T3 p.64 L12-18). The boat was making changes in course direction. (T3 p.121 L13-14 and L19-21). The GPS data showed the boat accelerated through use of the port engine. (T3 p.15 L13-17). After passing over the shoal the boat was able to get up to a speed around 5 knots.  (T2 p.238 L11-13). Mr. Pittman maneuvered the boat to set the anchor. (T2 p.181 L10-11). Mr. Pittman was able to keep the boat heading into the wind in order to drop the anchor.  (T3 p.66 L13-17).

According to Salvage Expert Witness Captain Timothy Morgan, the GPS datapoints "bread crumbs" demonstrated Mr. Pittman had control of the vessel as the turns depicted on the GPS data would not have been otherwise possible. (T3 p.163 L21 to p.164 L4). Mr. Biggs described the process of deploying the 100 pound anchor. (T3 p.65 L10-13). Two to two and half foot waves were hitting the bow. There was no spray coming over the bow. He did not get wet. (T3 p.66 L24 to p.67 L4).

Mr. Biggs was able to stand while deploying the anchor as was standard practice. It was not necessary to hold onto the railing around the boat. He did not wear a life jacket as Mr. Biggs said the conditions did not warrant it. (T3 p.67 L5-20; p.68 L4-5).

**Decision to Anchor**

After Mr. Pittman determined the starboard engine was not going to assist, it was decided to drop the anchor to determine what to do. (T3 p.64 L22-25). Plaintiff's expert Robert Starns confirmed the decision to anchor was a prudent move of a prudent mariner. (T2 p.113 L20 to p.114 L2).

**The Conditions at Anchor**

**Not Aground -** There was 5 feet of water underneath the bottom of the boat. The boat was in 10 feet of water. (T2 p.194 L24-25). The boat was not grounded. (T3 p.23 L17-19). It was not hitting bottom while sitting at anchor. (T3 p.73 L11–

17). The boat never touched bottom again that day after running over the sand bar. (T3 p.23 L17-20).

**Winds -** Winds were coming from the North/Northwest. (T3 p.109 L25; T3 p.147 L5-6; T2 p.124 L11-13). Both experts agreed the winds were blowing 11 to 15 knots with gusts of 22 knots.  (T3 p.149 L3-6; T2 p.139 L22 - p.140 L3).

**Waves -** Although Mr. Biggs thought the waves he experienced while on the bow were 2 to 2.5 ft.  Mr. Pittman testified the wave conditions at the anchorage were 1 to 2 feet. (T3 p.26 L22-25). Capt. Morgan comparing marks on the side of the vessel depicted in Exhibit J39 opined the wave striking the vessel was 1 and a half to 2 feet which would be consistent with the wind speed and direction that day.  (T3 p.145 L14 – p.146 L6).

**The Boat did not drag its anchor -** The anchor alarm was turned on**.**  The anchor alarm lets the crew know if the boat is drifting or dragging the anchor. The anchor alarm never tripped. (T3 p.12 L14-16). The boat was not dragging the anchor.  (T3 p.68 L 11-17). The anchor was holding. (T3 p.13 L 2-5; T3 p.24 L23-24). It was not slipping. (T3 p.26 L 10-11).

Defense expert Captain Morgan analyzed the GPS data. There is no evidence from the GPS data that the anchor was dragging.  (T3 p.154 L3-9). Plaintiff's expert, Mr. Starns, agreed there is no evidence that showed the boat was dragging its anchor.  (T2 p.111 L 22 - p 112 L7).

**Decision to call for a Tow**

Mr. Biggs and Mr. Pittman talked about different options: either return home with the port engine or just call for a tow.  It was decided to just call for a tow.  (T3 p.68 L17-20).  Mr Pittman said he called for a tow after considering the upside gain, downside risk.  The downside risk would be the cost of further damage if the boat was operated.  The upside gain would be the cost of a tow which he estimated at couple of thousand dollars.  (T2 p.189 L1-6).

**The Call for a Tow to Towboat Cape Coral**

Mr. Pittman asked Monty Biggs to call for a Tow. (T3 p.19 17-23). Mr. Biggs called TowBoat US for a tow. Biggs asked for a tow. (T3 p.68 L21 – p.69 L2; p.98 L5-6). Mr. Pittman heard Mr. Biggs ask for a tow. (T2 p.182 L22). The dispatcher never mentioned other services or that it might be a salvage event. (T3 p.69 L3-8).  The plaintiff's dispatcher, Tonya Morris', recollection was refreshed on cross examination. She recalled stating that "a gentleman said he was needing a tow." (T1 p.47 L18 – p.48 L19).

Biggs did not identify himself as the captain as he was not acting as a captain that day nor does he regularly use the title captain.  (T3 p.69 L13 – p.70 L4).  He never told the dispatcher to come quickly. Biggs did not tell the dispatcher the boat was dragging its anchor or drifting up on the beach. There was no likelihood the boat would end up on the beach as the Garmin GPS showed the boat

was swinging on its anchor.  (T3 p.70 L8 - p.71 L3). Mr. Biggs never told the dispatcher the anchor was dragging (T3 p.20 L21-24) because there was no reason to inform the dispatcher the boat was dragging its anchor. (T3 p.13 L6-9).  The boat was not dragging its anchor. (T3 p.13 L 2-5; T3 p.24 L23-24); (T3 p.154 L3-9); (T3 p.26 L 10-11); (T2 p.111 L 22 - p 112 L7).

Bigg's demeanor was professional during the call but due to his familial tremors his voice quivers. (T3 p.20 L4-15). Contrary to the testimony of the dispatcher (T1 p.35 LL22), no one on board was frantic. (T3 p.10 L9-10). Mr. Biggs did not say and couldn't imagine himself ever saying that he doesn't care what it costs.  (T3 p.71 L7-9).

## Peril

The people on board the Terry Leah did not perceive any peril to themselves, each other or the boat.  It is notable that no one on board felt it necessary to wear life jackets.

**Mrs. Pittman -** As an experienced sailor, Mrs. Pittman was able to walk around in the salon without difficulty while at anchor.  She was able to walk around the boat and went downstairs to the lavatory facility.  (T3 p.122 L21-25; p.123 L24 – p.124 L1; p.125 L18-19). Mrs. Pittman read her book while at anchor. (T3 p.123 L21-23).

Mrs. Pittman said it was quite comfortable in the bridge areas. She would have put on a life jacket if she felt she was in any kind of danger. (T3 p.122 L6-12). There was nothing different being at anchor on April 8, 2022 from other times that she anchored with the boat. (T3 p.123 L2-5).

She did not perceive any danger to herself or the boat at that time. (T3 p.123 L6-11). According to Mrs. Pittman no one was frantic or upset. (T3 p.121 L5-7).

**Mr. Biggs-** Mr. Biggs, an experienced mariner, did not consider either himself or the boat in peril. The seas and weather did not warrant it. (T3 p.72 L23 - p.73 L6). Monty Biggs never wore a life jacket during the event even when working on the bow of the boat. He never saw anyone on board the boat wearing a life jacket. (T3 p.75 L11-16).

The port engine moved the boat and there was no reason to think that that would cease to be the case. (T3 p.103 L12-15).

**Mr. Pittman -** Mr. Pittman did not believe either he or the boat was in peril. (T3 p.21 L14-18). He was certain he could have started the port engine and taken the boat into deep water. (T2 p.178 L 3-8).

There was no reason to put on life jackets because he determined they were not in peril. As Captain he is responsible for the safety of his passengers and crew. (T3 p.8 L14-20). Pittman would have ordered people on board to wear life jackets if there was a peril. Mr. Pittman did not order his wife Mary or Mr. Biggs to don

life jackets that day because he did not feel it was necessary.  (T3 p.8 L24 – p.9 L7).

**Captain Morgan –** The defense expert, Captain Morgan, testified that the situation experienced by the Terry Leah on April 8, 2022, would not have risen to the level of peril in his experience in the commercial towing and salvage business. (T3 p.141 L13-17).  The vessel was safely moored, the anchor was holding fast. Wind conditions weren't unusual, the sea weren't large.  (T3 p.141 L19 – p.142 L4; p.142 L11-15). There is no evidence the boat could not have successfully navigated back to safe harbor. (T3 p.164 L5-8).

Captain Morgan testified that the level of Lilly's anxiety doesn't necessarily correlate with the actual situation.  It could be his perception.  But according to Captain Morgan it was a "pretty benign day."  (T3 p.170 L23 – p.171 L2).

Lilly's testimony about the people on board the Terry Leah that day wearing life jackets was not true. (T3 p.9 L8-13).

**Distance from Shore**

The Terry Leah was not in a surf or breaker line near the beach. (T3 p.23 L11-16).  The boat was anchored 2300 ft from shore not the 125-250 as testified by Lilly. (T3 p.22 L24 to p.23 L1).

The expert witnesses for both parties agreed the boat the boat was offshore. Captain Morgan said the Sabre was sitting about 2,200 feet from shore. (T3 p.148

L21-23). Mr. Starns determined the boat was anchored 4/10's of a mile from the beach. (T2 p.122 L18).

The Court finds the boat was not in a state of peril from the perspective of the experienced mariners on board.  The Vessel had a functional engine, the anchor was holding and was not in danger. The Court finds the Terry Leah was not peril while sitting at anchor.

**Arrival of Lilly**

Mr. Lilly was dispatched by Plaintiff in response to the Defendants call for a tow. He arrived one hour and ten minuets after the call was placed.  (T2 p.60 L6-12).

**Communication -** Upon arriving on scene, Lilly communicated with Mr. Biggs by phone and voice. Biggs never spoke with Lilly by VHF radio.  (T3 p.106 L13-15). Lilly communicated by shouting when asking Biggs to drop the anchor. (T3 p.112 L8-13).

Contrary to Lilly's testimony, Mr. Pittman did not have any radio or telephonic contact with Lilly. (T3 p.10 L21-23). Mr. Biggs confirmed Mr. Pittman's testimony stating he never heard Pittman talking with Lilly while at anchor. (T3 p.106 L16-19).

**No mention of Salvage at Anchor -** Mr. Lilly never mentioned the term salvage while at anchor.  (T3 L16-17). Lilly never mentioned salvage when he contacted Mr. Biggs to drop the anchor.  (T3 p.76 L1-6).

Mr. Pittman was never informed by Lilly that he was going to claim salvage. (T3 p.20 L25 to p.21 L4).  Mrs. Pittman never heard the term salvage at all while on board the boat. (T3 p.124 L11-14).

Lilly admits he never disclosed to the people on the Vessel that he considered his services as salvage. (T1 p.170 L24 – p. 171 L10).

Salvage cannot be foisted on an unwilling captain. Captain Morgan testified it requires the assent of the person onboard a boat in order to render salvage services.  (T3 p.166 L17-24; p.167 L1-4).

The Court finds the Plaintiff never informed the Defendants prior to, during, or after performance that the services provided were to be considered salvage.  The Court further finds the Defendants never had a knowing opportunity to reject the Plaintiff's services.

**Salvage would have been rejected if informed the services provided were to be salvage**

Mr. Pittman testified if he was told Salvage was going to be claimed he would have looked for an alternative plan. He would have called another employee or navigated the Terry Leah under her own power.  (T3 p.21 L5-13). Mr. Pittman

had an employee who is a licensed captain that he could have called.  Pittman had a boat larger than the Tow Boat Cape Coral boat available to tow the Terry Leah. (T2 p.239 L1-5, L15-17).

**Arrival At The Marina – Discussion With Lilly – No Mention Of Salvage**

Upon arrival at dock, Lilly came on board to inspect.  There was a quart of water in the bilge, but water was not coming into the boat as a result of the event. There was no evidence of water leaking into the boat. Mr. Biggs never told Lilly the boat had taken on water as a result of the event. (T3 p.77 L13-18; p.78 L16-20; p.79 L2-16).  There was a little water in the bilge before the voyage.  (T3 p.96 L6-12).

The first time Mr. Pittman spoke with Lilly was at the dock at the shipyard. (T3 p.21 L19-21). Lilly never mentioned the word salvage while at dock when the Pittmans were on board. (T3 p.80 L1-4; p.22 L8-10). Lilly never mentioned the word "salvage" nor asked Mr. Pittman to sign a salvage agreement. (T2 p.246 L3-5).

Lilly watched the Pittmans leave. He did not call to Mr. Pittman asking him to come back. (T3 p.80 L9-18). Mr. Pittman did not "bolt" towards the exit as he is not physically capable. Lilly did not call out to the Pittmans.  (T3 p.22 L14-20).

Lilly could have walked out of the gate to chase Mr. Pittman because Lilly had Mr. Biggs' phone number. Biggs could have let him in.  (T3 p.80 L16-20; p.81 L2-6).

Shortly after the Pittmans left, Lilly got into his boat and left. He returned with an Ipad.  (T3 p.81 L7-19).

**Lilly returned with a Tablet**

Upon his return to the Terry Leah, Lilly said "I need to get you to sign this delivery receipt. It just simply states that we brought you to the dock safely.  If you could sign."  Mr. Biggs signed and requested a copy of what he signed.  Lilly turned around and in an agitated, raised and very threatening voice, said "So now you're calling me a liar." Lilly got into his boat and left. Mr. Biggs never received a copy.  (T3 p.82 L1-23).

Mr. Biggs never saw or had an opportunity to see the first page of the Salvage Contract. The Ipad was held by Lilly display only the signature line. (T3 p.81 L25 – p. 82 L1)  Biggs was never directed to look at the first page that contained the heading "Marine Salvage Contract" (T3 p.83 L12-17; Exhibit J5).

During Biggs' questioning, it was pointed out that under the signature line on the salvage contract produced at trial (Exhibit J5). Mr. Bigg's name was misspelled "Monte Briggs" instead of "Monty Biggs."  If Bigg's misspelled name on the signature line was present when Biggs signed, he would have said

something. Mr. Biggs did not see his name printed on the document he signed. (T3 p.83 L21 – p.84 L5).

**Forgery**

The putative contract produced at trial (Exhibit J5) contains two signatures. Only the top signature is Mr. Bigg's. (T3 p.83 L18-20).

Biggs only signed the document identified as a delivery receipt once on that day. According to Biggs, the second signature at the bottom of the document is not his. (T3 p.84 L6-11). Biggs has a condition called familial tremors. It affects his voice and hands. (T3 p.60 L4-8). It has no impact on his cognitive abilities or impact to navigate a vessel. (T3 p.60 L12-17). According to Mr. Biggs the bottom signature could not be his because the tremors would not permit the smooth loops on the second signature. (T3 p.84 L12 - p.85 L3).

The Court observed Mr. Biggs and has reviewed the signatures and determines the second signature is not the signature of Mr. Biggs. The second signature was a forgery.

**Plaintiff First Disclosed the Intent to Claim Salvage Three Days Later**

Three days after the event, Mr. Biggs received a call from Mr. Paul stating he was requesting $500,000 for the services provided on April 8' 2022. It was the first time Mr. Biggs heard the services were being considered a salvage event. (T3 p.71 L10-22; T1 p.232 L16 – p.233 L2).

**Services Provided**

Plaintiff's expert, Captain Morgan's assessment of the services provided was
that of a very simple tow. It was what he would do in any given day. "You go out
there; you pass a tow bridle to the disabled vessel. You pull it up over their anchor
line. You let them retrieve their anchor, and then you go on your way." (T3 p.171
L14-18).

The Court finds Lilly never provided any service other than towing the boat.
(T3 p.76 L22-24). In this situation the service provided was a tow. (T3 p.193 L17-
18).

If Plaintiff would have honored its contract with Defendants, the tow bill
would have been $3,570.00. Lilly expended 5.9 hours with the tow. Hennecy
assisting the tow in the harbor was estimated at 2.5 hours according to Mr. Paul.
(T2 p.63 L4-16; p.64 L23 – p.65 L2). The tow rate was $425.00 per hour. (T1 p.49
L2-6).

The Plaintiff repudiated the tow relying exclusively on salvage as the basis
for compensation. For reasons expressed herein, the Court has determined the
services were not salvage as there was no peril, there was no disclosure by Lilly
that the services were to be considered salvage. But if there would have been a
salvage event it would have been forfeited by the fraud and overreaching of the
Plaintiff.

**The Tow Operation was not a Success**

The operation was not a success because the Plaintiff left the anchor at the scene. (T3 p.178 L10-16).

## COUNTERCLAIM – FRAUD OVERREACHING

**DEMAND – OVERREACHING**

The demand of $500,000 Mr. Biggs received three days after the event displayed the intent to overreach and demand payment far in excess of the services provided.  The initial demand of $500,000 by Mr. Paul, Plaintiff's owner, was chosen by merely picking the number out of the air and was not based on any kind of science or Blackwall factors. (T2 p.27 L16-24). This initial demand was made three days after April 8th and was the first in a series of overreaching events.  (T2 p.27 L16-24).

The second demand was the April 12, 2022, salvage report requiring security in the amount of $375,000 in lieu of arrest (Exhibit J4) which described the event as a grounding with multiple efforts to free the boat from the strand.

> "Additionally, I have gotten the detailed report of salvage from the crew and staff involved. And all of them have advised that upon arriving at the Terry Leah, the vessel was aground on a sandbar with the anchor still deployed and unable to be lifted. . . . (T2 p.28 L14-19) After several more attempts were made, the Terry Lea was freed from her ground position through the efforts of my client and its crew " (Exhibit J4)

In compliance with the demand a Letter of Undertaking was issued on May 19, 2022, Mr. Pittman deposited the amount of $375,000 into the trust account of attorney Michael Karcher to prevent the arrest of the Terry Leah. (Exhibit J52).

The Second Amended Complaint filed June 29, 2022, was verified under oath by Richard Paul.  (Exhibit J65 at 1-18). The verification stated that he read the Complaint and was familiar with the contents, "and the source of my information is based on personal firsthand knowledge of the events described in the complaint and that the same is true and correct". (T2 p.49 L15-21).

Contrary to the oath, Paul did not have firsthand knowledge of the events. His knowledge was obtained by hearsay from his dispatcher and Lilly. The content of the verified Second Amended Complaint was Paul's impression of events. (T2 p.50 L2-7).

The Plaintiff's corporate representative admitted the content of various paragraphs of the Complaint has no factual basis.

Paragraph 13 represents the defendant vessel "was sitting on a sandbar." Plaintiff testified that "I don't know if it was sitting on a sandbar or not."  (T2 p.50 L9-20).

Paragraph 14 recites, "The at-issue vessel was in a heavy surf area on a sandbar violently bouncing off the bottom." Plaintiff acknowledged "since then

we've learned that's not true." (T2 p.51 L6-10). But the Plaintiff went forward at trial asserting the boat may have been hitting the bottom.

Paragraph 15 states the boat was grounded at that time. Plaintiff did not have personal knowledge of that fact. (T2 p.51 L19-22). At trial Plaintiff minced words asserting the boat was "in a grounded situation. It wasn't sitting on the bottom." (T2 p.54 L22-23). The term grounded situation was never defined but used as a method to deflect factually incorrect statements the boat was grounded.  But in his deposition, Mr. Paul admits Lilly "never said that she was sitting on a sandbar. (T2 p.29 L12-13).

Plaintiff did not have knowledge contained in paragraph 16, that "Plaintiff's salvage captain made multiple attempts in pulling the grounded vessel in the direction of the anchor." T2 p.53 L23 – p.54 L2).

Paragraph 17 of the Second Amended Complaint alleges in part that the "at-issue vessel was in danger of capsizing. (T2 p.54 L3-7). The Vessel was not in danger of capsizing. (T3 p.26 L7-10). Capsizing was a ridiculous claim as the boat was equipped with a seakeeper designed to stabilize the boat. (T3 p.28 L1-9).

In paragraph 18 Plaintiff once again plead without knowledge that the Terry Leah was grounded and the towing vessel "successfully pull[ed] the vessel off the sandbar and release the vessel from its ground position." (T2 p.54 L13-19). Mr.

Paul conceded he did not have any evidence that the vessel was touching bottom.
(T2 p. 30 L7-13).

The Court finds the Second Amended Complaint was not pleaded in good
faith. The Plaintiff proceeded to trial under the false statements at trial without
evidentiary support.

### INTERROGATORIES

The Interrogatories answers submitted by the Plaintiff continued to recite
facts that had no evidentiary support including the vessel was incapable of getting
itself into port without assistance which was incorrect.  (T3 p.27 L2-6).

Similarly Interrogatory 12 (Exhibit 82) represents "Captain Lilly made three
attempts to unground the vessel." This response was defended by Paul repeatedly
stating the Vessel was in a grounded situation rather than admitting the obvious
fact the boat was never aground while at anchor. (T2 p.59 L12 – p.60 L4).

The most egregious false response (Interrogatory 16, Exhibit 82 at 6) that
goes to the heart of the salvage claim was that "a verbal agreement was made
between the parties at the scene and a conforming contract was signed in safe
harbor." (T2 p.62 L11-14) This never happened according to the testimony of
Lilly, (T1 p.170 L24 – p.172 L10; D3 p.20 L25; D3 p.76 L1-60; D3 p.124 L11-
14). Yet, at trial after listening to the testimony of Lilly, Mr. Paul ratified the

Interrogatory response by stating that was what Lilly claims and he is "going with it." (T2 p.62 L15-21).

Interrogatory 21 requested Plaintiff "Identify all employees and staff of plaintiff that were involved in rendering services to defendants on April 8, 2022, and specify the total time expended by each person."

The response was: "Captain Lilly and Ryan Hennecy were the only employees involved in physically providing service to the vessel in peril. They each spent 5 hours 50 minutes time from dispatch to return to base."

At trial Plaintiff admitted the Interrogatory response was a misstatement. Paul retracted the claim for Hennecy stating he had only had two and a half hours total. (T2 p.63 L4-16; p.64 L23 – p.65 L2). This fact was known to the Plaintiff from day one but Plaintiff only retracted the claim upon cross examination at trial.

**Lilly – Financial Interest in Outcome**

It is clear to this Court that Lilly had a financial interest in this matter, despite what he testified to at trial. Lilly testified he never discussed his payment for this job and had no idea if he was going to be paid. **(**T1 p.135 L6-11; L15-16). Lilly allegedly did not even know how he was regularly compensated during his time working for the Plaintiff. (T1 p.136 L12-19; p.137 L12-15). Lilly went on to deny that he had any financial interest in this matter. (T1 p.137 L21-23). When confronted with his statements at deposition, Lilly refused to acknowledge any

monetary interest in the case (T1 p.138 L10-25; p.139 L1) despite admitting that once the vessel was on its way back to the marina, he texted Mr. Paul in part to find out if it was a high value boat (T1 p.202 L22 – p.203 L1-10; Exhibit J50) and texting the boat was worth "3.5M". (T1 p.204 L25 – p.205 L5). At that time Lilly was hoping "we can get paid." (T1 p.211 L10-12). Lilly's feigning ignorance of his financial stake in the salvage can't be reconciled with his texts.

Mr. Paul, however, testified that Lilly's compensation for salvage is 20% and it was explained to Lilly. (T2 p.39 L2-8; p.40 L4-5). At the time of the demand to post $375,000 security Lilly's putative share was $75,000. This Court does not believe that Lilly had no idea of his potential financial interest in this case, especially given his earlier texts to Mr. Paul. Hiding his economic interest in the matter is another instance of Lilly's lack of credibility.

**Plaintiff's Protocol for Informing Customers of Salvage**

Plaintiff's protocol for informing customers the services rendered was salvage is between the captain and dispatcher. "One of them should inform them that this is an uncovered job.  This is going to be salvage. This is going to be something different." (Paul Deposition page 89 Line 6; T2 p.46 L12-20).  This protocol was not followed on April 8, 2022, after Mr. Biggs called for a tow.

Towboat Cape Coral honors its verbal commitments (T2 p.46 L25 – p.47 L2) but did not do so in this matter. The Plaintiff violated its own policy of

TowBoat Cape Coral "to convey to boat owners how they'll be charged before services are provided." (T2 p.47 L18-21). Mr. Paul excuses the breach of his Company's policy (lack of notification to Defendants) because the dispatcher was new and did not know the policy.  (T2 p.47 L9-17).  The fact the dispatcher was new does not exonerate the Plaintiff from failing to follow its protocol.

**Gross Exaggeration/Misstatement/Fraud**

**Aground -** Lilly testified he didn't know whether the vessel was grounded or not but it was behaving as a grounded vessel and threatened to capsize his vessel. (T1 p.90 L 5-9).

Lilly would not provide a yes or no answer as to whether the vessel was aground. (T1 p.179 L2-14). Instead, he proceeded to testify that the vessel was in a "grounded position." (T1 p.178 L18 – p. 179 L13; p. 179 L20; p.180 L3-10). A grounded position was to mean "it could possibly be on the bottom, off the bottom, or near the bottom at a period." (T1 p.178 L8-10). This was the opposite testimony from his deposition testimony where he clearly identified the vessel as being on the bottom. (T1 p.180 L14 – p.181 L14). This is also in contradiction to what was plead in the Second Amended Complaint. Lilly avoided ever stating what the actual condition of the vessel was in when he was attempting to provide a tow. (T1 p.181 L15-22).

Lilly knew the boat was not aground and was holding fast on its anchor.  In his written report Lilly wrote "vessel holding 5.5 foot draft and 4 to 6 feet of water under Terry Leah." (T1 p.214 L5-13). This contemporaneous statement is consistent with Mr. Pittman's testimony the boat was in 10 feet of water. (T3 p.23 L17-20; p.24 L7-17). When confronted with the contradiction Lilly testified he meant to say it was 4 to 6 feet down from the waterline of the vessel. (T1 p.215 L2-10). He explained the discrepancy as "under, under, waterline, what not. What different – who knows? I was – I just had a baby. I was starting a new company. I was in the middle – I might have – who knows?" (T1 p.215 L14-19).

On page 49, line 14 of his deposition, Mr. Paul testified that Lilly never told him the vessel was sitting on a sandbar. (T2 p.29 L8-13). Which is consistent with Lilly's written report but inconsistent with the demand and pleadings.

**Anchor Dragging -** Lilly claims that the Vessel called him frantically stating the vessel was dragging and that they were going to end up on the beach. (T1 p.71 L13-25).  Lilly says that the fact the vessel may have been swinging on its anchor meant nothing to him. (T1 p.101 L21-23).

Lilly insists the anchor was dragging and that the vessel was going to end up on the beach. (T1 p.160 L2-4).  Lilly claims he was told that the anchor was dragging and vessel going to end up on the beach. (T1 p.169 L23-25; p.171 L7-10). He never saw the anchor holding in position. (T1 p.171 L18-19).

Lilly testified that he viewed the GPS data associated with the vessel after the fact. In that evidence, Lilly claims that it shows evidence of dragging its anchor. (T1 p.172 L19-24). This is reinforced in his mind not because of the GPS data, but because in his own mind there is no other reason to put 150ft of anchor line out.  Despite Lilly's testimony at length that the anchor was dragging, he simultaneously admits that he could not pull the vessel because the anchor was set. (T1 p.173 L7-8).

Lilly's testimony is contrary to facts and the testimony of Pittman, Biggs, Morgan and Starns.    The anchor alarm was turned on**.**  The anchor alarm lets the crew know if the boat is drifting or dragging the anchor. The anchor alarm never tripped. (T3 p.12 L14-16). The boat was not dragging the anchor.  (T3 p.68 L11-17). The anchor was holding. (T3 p.13 L2-5; p.24 L23-24). It was not slipping. (T3 p.26 L10-11).

Defense expert Captain Morgan analyzed the GPS data. There is no evidence from the GPS the anchor was dragging.   (T3 p.154 L3-9). Plaintiff's expert, Mr. Starns, agreed there is no evidence that showed the boat was dragging its anchor.  (T2 p.111 L22 – p.112 L7).

The Court finds Lilly's testimony not credible as it is against the manifest weight of the evidence including Lilly's own snapshot (Exhibit J49), which shows the boat pulling on the anchor holding fast.

**Drifting -** While waiting for Monty to affix the bow line, Lilly claims the wind was blowing his vessel down the beach like a kite prior to his saving the vessel from peril. (T1 p.81 L13-20).

Lilly was not credible when he attempted to defend his prior testimony at deposition that the wind on the day of the incident was coming from the northeast. He insisted that as he lived in North Carolina that "a northeast wind is kind of the same thing as a northwest wind in Southwest Florida." (T1 p.147 1-18; p.148 L8-19; p.149 L13-24).

Lilly insisted that a northwest wind would blow him down the beach, towards the beach. (T1 p.151 L6-10).

Lilly stated that as a captain he was able to interpret GPS tracks. (T1 p.167 L6-8). His testimony that the GPS tracks show a lack of control over the vessel is not credible to this Court. (T1 p.169 L2-18). Despite Lilly's testimony, this Court gives weight to Defendant's expert Timothy Morgan regarding steering and maneuverability. (T3 p.163 L21 – p.164 L4).

Plaintiff expert Starns could find no evidence to support Lilly's statements the boat was drifting towards the beach. (T2 p.121 L13-19).

**Distance from Shore -** Lilly said he felt that the vessel was only a hundred or two hundred feet from the shore (T1 p.155 L21-23; p.156 L8-14) in an effort to create peril. The Terry Leah was not in a surf or breaker line near the beach. (T3

p.23 L11-16).  The boat was anchored 2300 feet from shore not the 125-250 feet as
testified by Lilly. (T3 p.22 L24 – p.23 L1).

The expert witnesses both agreed the boat the boat was offshore.  Captain
Morgan said the Sabre was sitting about 2,200 feet from shore. (T3 p.148 L21-23).
Mr. Starns determined the boat was anchored 4/10's of a mile from the beach. (T2
p.122 L18). There is no evidence to support Lilly claim that the boat was 125 to
250 feet off the beach. (T3 p.169 L3-8). This testimony is reinforced by the
objective GPS data presented to this Court. (See Exhibit J3).

**Breaker Line -** Lilly claimed that the entire area around the boat was white
water and shoaled area. (T1 p.76 L3-5; p.95 L9-12; p.122 L22-24; p.123 L1-3).
Lilly insisted the vessel was in the breaker line because he saw the white water and
the shoaled area. (T1 p.156 L15-19).

When confronted with Exhibit J49 showing the boat at anchor, Lilly
continued to insist the vessel was amongst breaking waves. (T1 p.156 L14-20;
p.158 L5-6). Lilly did not seem to understand what the difference was between a
breaker line and a shoaled area, using the two interchangeably. (T1 p.159 L4-9;
L14-17).

There is no evidence the boat was in a breaker line. (T3 p.169 L9-12). Starns
did not see actual breakers from the photo taken by Lilly at anchor.  (T2 p.136 L4-
6). Neither did Mr. Pittman who was at the scene.  (T3 p.25 L11-14).

**Surf Line**

Mr. Pittman testified the boat was not in the surf. (T3 p.23 L15-16). There is

no evidence the boat was in a surf line. (T3 p.169 L13-16) as plead in paragraphs

14 and 15 of the Second Amended Complaint.

**Wave Height -** Lilly told Paul the seas were 4 to 6 feet with an occasional 8. (T2

p.41 L19-21). These wave heights were pleaded in paragraph 22 of the Verified

Second Amended Complaint.  Lilly admitted he had no idea what the height of the

wave was in Exhibit J49. (T1 p.158 L13-16).

While being examined on Exhibit J49, Lilly's testimony was unclear

regarding the actual height of the waves at the boat "they are probably 8-footers

right here through the shoal…", "but in the main channel, you're going to have 8-

footers… so there's probably 8-footers right here that you're looking at as

well…At the boat." (T1 p.163 L1-15). Regardless of Mr. Lilly's testimony this

Court has reviewed Exhibit J49 and can see no evidence of any eight foot wave

either here or in any other exhibit in this case.

The wave heights were exaggerated by Lilly.  Plaintiff's expert Starns said

the waves depicted in the photo of the boat at the scene of the anchor were not

even 4 ft.  (T2 p.132 L24 – p.133 L1).

Captain Morgan testified the Terry Leah was experiencing a 1 to 2 foot

surface chop. (T3 p.190 L23 – 25). There was nothing close to 6 to 8 foot seas.  It

was light surface chop. (T3 p 142 L5-7). Nothing close to 4 to 6 foot seas. (T3

p.146 L15-17). Mr. Pittman testified the waves were about a foot. (T3 p.41 L16-

18). Mr. Biggs standing on the bow deploying the anchor without a life jacket and

not holding on to the lifeline estimated the waves hitting the bow at two to two and

a half feet. (T3 p. 66 L24 - p. 67 L4).

Lilly refused to admit that the journey back to the marina was calm despite

the photo of the tow. (Exhibit J50). When looking at the photo with the catenary

line, he stated the seas were maybe 4-5ft waves. (T1 p.207 L2-5, L13-19).

According to Captain Morgan, Lilly would not be able to see the horizon in

the trough of a wave if the seas were 6 to 8 feet. (T3 p.170 L3-7). If the seas were 6

to 8 foot, there would be multiple points where the towline would be buried into

the sea while towing the Terry Leah. (T3 p.157 L 9-11; Exhibit J41). The photos

taken of the tow show waves consistent with the 1 to 2 foot range. (T3 p.157 L2-7;

Exhibit J41).

Mr. Paul had no firsthand knowledge whether the seas were 4 to 6 feet with

an occasional sea of 8 feet. (T2 p.41 L10-14).

The Court having viewed the snapshot of the video and hearing the

testimony of other witness does not find Mr. Lilly credible when describing the

height of the waves on the day of the event.

**Boat Washing up on the Beach**

To justify a finding of peril Lilly insisted the anchor was dragging and that the vessel was going to end up on the beach but for his efforts. (T1 p.160 L2-4; p.169 L23-25; p.171 L7-10). Lilly testified that the winds were blowing on shore. (T1 p.97 L19-21). Lilly alleged had he been unsuccessful then the vessel would have ended up on the beach. (T1 p.98 L15-18).

The evidence does not support this contention.  Typically, a vessel is going to drift downwind from the direction that the wind is coming from. The wind was coming from the north/northwest according to the two expert witnesses. (T3 p.147 L5-6; T2 p. 84 L9-13). The boat would drift in the south/southeast direction.  If the boat parted its anchor chain, it would drift south. The boat would drift further away from the beach according to Captain Morgan. (T3 p.153 L8-17). This view was confirmed by Plaintiff's expert Mr. Starns (T2 p.125 L14-17; p.201 L17 - p.202 L4).  It was not possible to wash up on the beach. (T3 p.169 L22-23; p.153 L6-17).

It is noteworthy that Lilly's deposition testimony differed greatly from his trial testimony regarding the wind direction. At deposition Lilly repeatedly testified the wind was coming from the Northeast not the north/northwest. (T1 p.147 L1-3; p.147 L12-14; p.148 L10-13; p.149 L13-16) which would have clearly blown the Terry Leah out into the Gulf. Lilly explains away his error by stating, "So I live in North Carolina: Right? And a Northeast wind is kind of the same thing as a

northwest wind in Southwest Florida." (T3 p.147 L15-18). Irrespective of geography, it does not make Lilly's explanation credible.

**Life Jacket –** As another example of Lilly attributing non-existent peril to the situation, was Lilly's testimony that the people on the vessel were wearing life jackets. (T1 p.160 L4).

Lilly's testimony is inconsistent with the testimony of those on board and further was inconsistent with his own recollection of the event. Lilly couldn't recall whether it was all three occupants wearing life jackets or just one or two. (T1 p.85 L6-14). He knows after the fact he saw one life jacket sitting on the deck. (T1 p.86 L1-5).

Lilly "knows" at least one person was wearing a life jacket. (T1 p.151 L18-21; p.152 L4-6). Lilly couldn't recall if Mr. Biggs was wearing a life jacket, he could have been. (T1 p.183 L25 – p. 184 L3).

Notwithstanding his lack of recollection, Lilly continuously reaffirmed that he saw people on the vessel wearing life jackets at the scene. (T1 p.100 L23 – p.101 L1). Lilly later testified that all of the people on the vessel had life jackets on and that they were frantic. (T1 p.199 L20-25; p.211 L1).  Lilly told Mr. Paul people on board the boat were wearing life jackets. (T2 p.35 L18-19).

This wandering testimony of Lilly is clearly false according to the testimony of those on board which the Court deems credible.

The primary responsibility of the tower when arriving on scene is safety. If there was a safety issue the tower would tell people, if warranted, to wear life jackets. (T3 p.167 L11-21). When a tower connects to a boat the tower is 100 percent responsible for our safety and their safety and the vessel we're towing. (T3 p.168 L1-3).

If Lilly thought the vessel was in peril, he should have informed the people on board the boat to wear life jackets. (T2 p.33 L13-19; p.35 L14-19).

**Lilly hid the videos of the sea state -** The first action Lilly performed on scene was to "snap a picture of the boat" and then tell the Vessel what to do. (T1 p.74 L2-7). Lilly again referred to Exhibit J49 as a photograph when Exhibit J39 clearly shows the image was selected out of a video. (T1 p.162 L6-7; Compare Exhibit J49 to Exhibit J39).

Lilly could not credibly explain why the video no longer existed or his texted comment to Mr. Paul, "I've got video, and I'm trying to still-shot the best ones. The video and pictures don't even do it justice." (Exhibit J50; T1 p.208 L6-17, 24-25; p.209 L1-13).

When confronted with evidence that the picture from J50 was from a video, Lilly disregarded the significance and denied cherry-picking the video. (T1 p.210 L2-11). Lilly claims that the best shots showing the most dangerous conditions

were never taken because his life was in danger, a comment the Court does not find credible. (T1 p.210 L17-25).

The experts agreed it would have been much more helpful to properly discern the conditions if the unproduced video was provided versus a snapshot picked from a video. (T3 p.188 L14 – p.189 L8).

Plaintiff's expert requested but did not receive the entire videos taken by Lilly at the scene. (T2 p.133 L23-p.134 L2.) He only saw a snapshot taken out of the video. Starns said it would have been better to have seen the rest of the video. The waves depicted in the photo of the boat at the scene of the anchor were not 4 ft.  (T2 p.133 L8-22).  Starns would have preferred the entire video. (T2 p.135 L22-24).

According to Captain Morgan, taking snapshots is a technique salvors will use to take the most opportune time to take a photo when the wave hits or take a picture off a video to bolster what they are trying to present. (T3 p.189 L24 – p.190 L3).

As the video was taken by and in the control of the Plaintiff but not provided to the witnesses or the Court at trial, the Court presumes it showed conditions inconsistent with or detrimental to the Plaintiff's position and did not support Lilly's testimony as to sea state.  The Court finds Lilly's testimony as to sea state not credible.

**Lilly Method of Communication**

Another contradiction arises with the method of communication between Lilly and the Vessel. Lilly testified he used the radio to speak with the Vessel after he had made two unsuccessful attempts to tow the Vessel. (T1 p.69 L17-21). Mr. Biggs recalls Lilly communicated by shouting when asking Biggs to drop the anchor. (T3 p.112 L8-13). Lilly testified after the two failed attempts, someone on the vessel was getting more frantic over the radio. (T1 p.88 L3-8, L16-18; p.84 L6-15). Lilly went on to state the owner was freaking out on the radio on Channel 16. (T1 p.93 L7-16; p.182 L15-21).

Both Mr. Pittman and Biggs deny using the radio to communicate with Lilly. Mr. Pittman said he never spoke with Lilly at all while the vessel was at anchor. Pittman states Lilly's testimony isn't true about speaking with him at anchor. (T2 p.214 L12-23). Pittman never communicated with Lilly by VHF or phone. (T2 p.216 L22-25). Mr. Biggs said he communicated with Mr. Lilly by phone and voice. However, Biggs never spoke with Lilly by VHF radio. (T3 p.106 L13-15). Mr. Pittman recalls Biggs spoke with Lilly on the phone. (T2 p.217 L6-9).

According to Mr. and Mrs. Pittman no one was frantic or upset. (T3 p.121 L5-7; p.10 L9-10).

The Court, having observed the demeanor of the witnesses at trial, credits the recollection of occupants of the Vessel over Lilly's. The occupants were

experienced sailors who were rightfully unconcerned about their safety and the safety of the Vessel given the conditions.  Conversely, Lilly was excitable and frenetic while testifying. The Court finds that the testimony of the experienced sailors on board the vessel to be the more credible version of the events.

**Events at the Dock**

Lilly testified after the Vessel reached dock, Monty Biggs took him into the engine compartment and pointed out where the water was coming in. (T1 p.104 L15-23). Lilly continuously repeated his contention that the vessel had water coming into its hull. (T1 p.127 L12-20). (Viewing Exhibit J46).

Mr. Biggs checked the engine room immediately after hitting the sand bar. There was no water ingress into the engine room. (T3 p. 63 L22 - p.64 L2). Biggs described the water viewed in the bilge amounted to about a quart of water. But that small amount is the result of maintenance on the air conditioner. (T3 p.77 L16-22). It is not enough was to start the bilge pump to dewater. (T3 p.78 L16-19). Biggs never said to Lilly the boat had taken on water.  (T3 p.79 L14.16).

Lilly grossly distorted the movements of people after the Vessel reached the dock. He claims that Mr. and Mrs. Pittman left almost immediately after the vessel returned to dock "almost like they [were] leaving the scene of a crime." (T1 p.106 L3-19; p.184 L20-21; p.194 L4-6). Lilly was unable to follow them through the gate as he was afraid he would have been locked out of the Marina. (T1 p.106 L13-

15; p.195 L1-4). Lilly testified that he may have called out to Pittman when he was leaving but couldn't remember. (T1 p.195 L22 – p.196 L4). Biggs has a different version.  When the Pittmans departed, Mr. Lilly did not call out to Mr. Pittman to come back. (T3 p. 80 L13-15).

Biggs testified Mr. Pittman was on the boat for approximately 20 to 25 minutes prior to leaving. (T3 p.79 L22-25). Lilly's testimony about the locked gate did not make sense to Biggs because he could have walked to the gate and opened it for him. (T3 p.81 L2-4).

**Communication with Mr. Paul at time of signing iPad**

Lilly falsely claimed multiple times that Mr. Paul was on the phone with Mr. Biggs while the three of them discussed the events and the salvage contract. (T1 p.185 L25 - p.186 L2; p.186 L18-2; p.187 L2-6; p.107 L16-19; p.112 L7-12; p.187 L20-24). Lilly went on to explain that the salvage contract on the ipad was discussed between Mr. Paul, Mr. Biggs and himself. (T1 p.184 L8-15). However, Lilly was unable to provide any details whatsoever to the conversation other than the salvage contract was allegedly identified. (T1 p.185 L2-21). Lilly was unable to provide detail as to any of the contents of the actual conversation stating that it was "irrelevant" and that he was "scrambled" from the emergency situation and adrenaline. (T1 p.189 L17 – p.190 L25). When confronted with Mr. Paul's deposition testimony that Paul only spoke with Mr. Biggs three days later, Lilly

disregarded it and insisted that Mr. Paul was on the phone. (T1 p.186 L3-12, L18-23). Lilly was unable to credibly testify as to why Mr. Paul sent a text at 7:54PM asking if the salvage contract was signed if Mr. Paul was present on the phone while the contract was executed. (Exhibit J50; T1 p.212 L16-24). Again, Lilly simply said it's irrelevant.

Mr. Paul's testimony provided later in this trial directly contradicts Lilly. Mr. Paul confirmed his first conversation with Mr. Biggs occurred the Monday after the event. (T2 p.26 L23-25).

**Salvage Contract Inconsistencies**

Lilly inserted his name on the putative contract as the Captain of the Terry Leah and inserting the wrong time on the putative contract. (T1 p. 190 L14- 25; p.191 L17 - p. 192 L5). Lilly had no idea where the information about PURE being the insurer came from despite testifying Biggs said they were not filing an insurance claim. (T1 p.191 p.18 - p.192 L8; p.192 L21 - p.193 L2).

Lilly could not explain why Mr. Biggs's name was spelled wrong on the contract. (T1 p.196 L10-20). He denied adding names later and again deflected the question stating he did not see why the contract is a big deal. (T1 p.197 L3-9; p.199 L17-18).

Biggs testified he did not see his name misspelled at "Monte Briggs" on the delivery receipt he thought he signed. He would have said something as his name is "Monty Biggs." (T3 p. 83 L 20 - p. 84 L5).

The multiple discrepancies further reinforce Mr. Bigg's version of events including the representation by Lilly the document was a delivery receipt and the Bigg's statement his signature was forged.

**The variance of descriptions of the event**

The first opportunity Mrs. Pittman had to hear Lilly's side of the story was in the courtroom she said "I don't think I was in that boat that he was describing. It was a very different scenario of what I participated in."

The conditions of the Terry Leah were not ever close to what Mr. Lilly described. (T2 p.241 L 20-23; T3 p.30 L8-10).

After considering the entire testimony in this matter, the Court finds the recollections of the individuals on board the boat are credible and more consistent than Lilly's. The Court finds Mr. Lilly's testimony as not credible.

**Danger - Self Induced**

Captain Morgan, an experience salvor, described self-induced peril "it's kind of like you're creating the situation. You're creating the peril by your actions sometimes. You could actually make it a situation where it's dangerous certainly for you by not using proper -- proper procedures." (T3 p.173 L7-12).

Lilly having that amount of towline out, especially if he got the boat off the quarter – you can roll them over if you don't operate them properly is an example of self-induced peril.  (T3 p.173 L16 – p.174 L2).

The tow line should have been about 50 to 75 feet off the bow.  Lilly would have been able to control it a lot more. The reason the anchor chain and anchor was lost was because Lilly was not able to control the vessel.  It was virtually impossible to have Lilly to be able to control that boat to bring it up over the chain. (T3 p.159 L9-24; p.160 L13-18).

Morgan opines Lilly would have been able to successfully pull the boat forward had it used a 50 foot towline. (T3 p.161 L8-14). The procedure used by Lilly towing the vessel back and the prosecution of the whole matter demonstrates Lilly was not very experienced.  (T3 p.172 L5-7, L17-20).

Captain Morgan's assessment of Lilly's lack of competence was bolstered by Mr. Biggs an experienced captain with a towing endorsement on his 200 ton license. (T3 p.58 L24 to p.59 L2). Biggs observed Lilly had a lot of tow line out, much more than necessary.  Further pulling the boat forward would only pull them across the sandbar that was originally hit. (T3 p.108 L15-18). Biggs felt the manner in which Lilly was trying to tow the boat into the wind was almost setting up a tug of war. (T3 p.111 L14-16).  Plaintiff failed to provide any rebuttal testimony on the topic.

## CONCLUSIONS OF LAW

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333. Federal district courts have original jurisdiction over admiralty and maritime cases. This jurisdiction exists over the Plaintiff's breach-of-contract claim, Maritime Lien, and Quantum Meruit arising from a maritime contract, meaning a contract that is "wholly maritime in nature, or [with] non-maritime elements [that are] either insignificant or separable without prejudice to either party." *Inbesa Am., Inc. v. M/V Anglia*, 134 F.3d 1035, 1036–37 (11th Cir. 1998) (alterations added; citing *E.S. Binnings, Inc. v. M/V Saudi Riyadh*, 815 F.2d 660, 665 (11th Cir. 1987); other citation omitted). In addition, the Court has jurisdiction over Defendant's Counter Claim as the issues arise from the same facts and circumstances.

Venue is proper in the Middle District of Florida because a substantial part of the events or omissions giving rise to the claim occurred in the coastal waters of Lee County, Florida and Plaintiff resides there.

> "When conducting a bench trial under Rule 52(c), the court not only determines matters of law but it also decides matters of fact. See *United States v. $ 242.484.00,* 389 F.3d 1149, 1172 (11th Cir. 2004). As the trier of fact, the court may resolve conflicts in the evidence and make credibility determinations. See *Caro-Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1504 (11th Cir. 1993); *Stearns v. Beckman Instruments, Inc.,* 737 F.2d 1565, 1568 (Fed. Cir. 1984)." *Macky Bluffs Dev. Corp. v. Advance Constr. Servs.,* 2008 U.S. Dist. LEXIS 83960, *1-2 (N.D. Fla. 2008).

"Generally, when a plaintiff's claims support admiralty jurisdiction, the court will apply federal admiralty law." *Smith v. Carnival Corp.*, 584 F. Supp. 2d 1343, 1348 (S.D. Fla. 2008) (citing *Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 902 (11th Cir. 2004); other citations omitted). The elements of breach of contract under both admiralty and Florida law are the same: "existence of a valid contract, a material breach, and damages." *Kol B'seder, Inc. v. Certain Underwriters at Lloyd's of London subscribing to Certificate No.154766 under Contract No. B0621MASRSWV15BND,* 261 F. Supp. 3d 1257, 1266 (S.D. Fla. 2017) (alteration added; citations omitted).

## ORAL CONTRACT

In Admiralty, oral contracts are enforceable. *Sweet Pea Marine, Ltd .v. APJ Marine Inc*, 411 F.3rd 1242 (11th Cir. 2005); *Venus Lines Agency, Inc. v. CVG Int'l Am.Inc.,* 234 F.3rd 1225(11th Cir.2000); *Delta November, LLC v. Baker,* 2011 U.S. Dist. LEXIS 116000, *7 (S.D. Fla. 2011).  "Under the governing general maritime law principles, "it is an established rule of ancient respectability that oral contracts are generally regarded as valid." *Kossick v. United Fruit,* 365 U.S. 731, 734, 81 S. Ct. 886, 6 L. Ed. 2d 56 (1961), reh'g den., 366 U.S. 941, 81 S. Ct. 1657, 6 L. Ed. 2d 852 (1961); *Vieira v. Maher,* 1999 AMC 577 (E.D.N.Y. 1999)." *Sea-Land Serv. v. Sellan,* 64 F. Supp. 2d 1255, 1261 (S.D. Fla. 1999).

This includes oral contracts to tow a vessel. *Flagship Marine Servs. ,v. Belcher Towing Co.,* 966 F.2d 602,606 (11th Cir. 1992) (a valid oral agreement which bars Sea Tow from recovering an award on the basis of pure voluntary salvage). *See Flagship Marine Servs. v. Belcher Towing Co*., 966 F.2d 602, 606 (11th Cir. 1992).

Here, the Parties formed an oral contract when a tow was requested by Mr. Biggs. The Defendant agreed to pay by providing a credit card. This constitutes the offer and consideration. Plaintiff accepted the offer by dispatching the vessel as requested. A contract for a tow was formed. Plaintiff performed the contracted services by towing the Terry Leah.

**TOW vs. SALVAGE**

As the courts have noted "there is a difference between towing and salvage. The former is done for convenience while the latter is done in situations of peril. *The Flottbek,* 118 F. 954, 960 (9th Cir. 1902)." *N.E. Taylor Boatworks, Inc. v. M/V Sir Winston,* 2011 U.S. Dist. LEXIS 126745, *9 (M.D. Fla. 2011).

> Salvage service is to be distinguished from towage service in that the latter is a service which is rendered for the mere purpose of expediting a vessel's voyage, without reference to any circumstances of danger, although the service in each case may be, and frequently is, rendered in the same way.

*La Rue v. United Fruit Co.,* 181 F.2d 895, 898 (4th Cir. 1950).

Having considered the totality of the circumstances, the Court

determines the services performed by Plaintiff constituted a tow not salvage

as their services were request for the convenience to expedite the Terry

Leah's voyage home.

> The distinction between towing and salvage generally turns upon
> the "'totality of the circumstances'" with towing typically undertaken
> from a position of safety for the purpose of expediting a voyage and
> salvage undertaken from a position of danger for the purpose of
> removing a vessel from some distress. 8 Benedict on Admiralty §
> 14.02 (2004). Thus, a salvage service "'is voluntarily rendered to a
> vessel requiring assistance, and is designed to relieve her from some
> distress or danger either present or to be reasonably
> apprehended.'" Star Towing Co. v. The Barge Org-6504, 301 F. Supp.
> 819, 822 (E.D.La. 1969) (quoting Norris The Law of Salvage § 188
> (1958)). In contrast, "'A towage service is one which is rendered for
> the mere purpose of expediting her voyage, without reference to any
> circumstances of danger.'" Id. at 822.

*Joseph v. J.P. Yachts, LLC*, 436 F. Supp. 2d 254, 268 n.36 (D. Mass. 2006).

**MARINE PERIL**

The Terry Leah was not in in a state of peril; she was not in danger of loss or

destruction.

"In determining whether peril existed at the time of the alleged salvage, the

court must consider whether the ship was in a situation that might expose her to

loss or destruction. *Markakis v. S/S Volendam*, 486 F. Supp. 1103, 1106 (S.D.N.Y.

1980)." *Day-Petrano v. Vessel Mistress*, 2005 U.S. Dist. LEXIS 59030, *11 (M.D.

Fla. 2005).

> A maritime peril does not exist where "the vessel has the situation under control such that there is no 'reasonable apprehension for her safety in the future if left to her own unaided efforts.'" *Fine v. Rockwood*, 895 F. Supp. 306, 309 (S.D. Fla. 1995) (quoting *The J.C. Pfluger*, 109 F. 93, 95-96 (N.D. Cal. 1901). "However, the danger need not be immediate or actual. All that is necessary is a reasonable apprehension of peril." *Id.* at 309 (citations omitted).

*Biscayne Towing & Salvage, Inc. v. M/Y Backstage*, 615 F. App'x 608, 610 (11th Cir. 2015).

The evidence established the boat had the ability to navigate and maneuver after running over the sandbar. Defendant decided to anchor and call for a tow from a tow vessel rather than navigate on one engine or contact the owner's employee for assistance. The boat was safely at anchor, over 2200 feet from shore. The Terry Leah was not disabled and the situation was under control.

"If the vessel has the situation under control, such that there is no reasonable apprehension for her safety if left to her own unaided efforts, then there is an absence of a peril. *Id*. (citing *Fine v. Rockwood*, 895 F. Supp. 306, 309 (S.D. Fla. 1995))." *Atlantis Marine Towing, Salvage & Servs. v. Deep Impact*, 2019 U.S. Dist. LEXIS 223314, *10 (S.D. Fla. 2019).

> 'The existence of a marine peril distinguishes a salvage contract from one for towage.' *Evanow,* 163 F.3d at 1114; accord *Schoenbaum,* supra, § 16-1. That is, towage is undertaken 'from considerations of convenience,' whereas salvage is aimed at saving a vessel that is 'disabled, and in need of assistance.' *Evanow,* 163 F.3d at 1114 (quoting *The Flottbek,* 118 F. 954, 960 (9th Cir. 1902)); see also *Lloyd's Syndicate 1861 v. Crosby Tugs, L.L.C., No. 13-5551*, 2014 U.S. Dist. LEXIS 98628, 2014 WL 3587375, at *3 (E.D. La. July 21, 2014) (collecting authorities).

*Farnsworth v. Towboat Nantucket Sound, Inc.,* 790 F.3d 90, 93 (1st Cir. 2015).

The experienced mariners on board the Terry Leah were not apprehensive as to their personal safety or the safety of the vessel.  None felt the necessity to wear life jackets. The Court credits the testimony of Mrs. Pittman, that she was comfortable moving about the vessel and resuming her reading while the vessel was at anchor.

"Whether a marine peril exists is a question of fact. The peril necessary to constitute a salvage service need not be one of imminent and absolute danger; the danger must simply be present or reasonably to be apprehended. 'The burden of proof that the vessel or property is in peril is upon the one claiming a salvage award.'" *Sunglory Mar. Ltd. v. PHI, Inc.,* 2016 U.S. Dist. LEXIS 27765, *40-41(E.D. La. 2016).

> "'Reasonable apprehension of injury or destruction if the services are
> not rendered' is the standard by which peril is adjudged to be present."
> *B.V. Bureau Wijsmuller*, 702 F.2d at 338 (quoting *Phelan v. Minges*,
> 170 F. Supp. 826, 828 (D. Mass. 1959)).
> *In re City of New York,* 534 F. Supp. 2d 370, 377 (E. D. N.Y. 2008).

Given the experience of the persons on board the Terry Leah, the Court finds credible their testimony that the vessel was not in danger or peril and finds this assessment to be reasonable under the circumstances.

It is axiomatic that "[i]f there is not any danger, the services cannot be called marine salvage. *B.V. Bureau Wijsmuller,* 702 F.2d at 338." *In re City of New York,* 534 F. Supp. 2d 370, 377 (E.D. N.Y. 2008).

> 'Absent danger, any services rendered a vessel cannot properly be called salvage and a person rendering such unnecessary service is not styled a salvor but an opportunist or an officious intermeddler.' *B.V. Bureau Wijsmuller,* 702 F.2d at 338 (citing *Phelan v. Minges,* 170 F. Supp. 826, 828 (D. Mass. 1959).

*Lemoine v. Pine Bluff Sand & Gravel Co*., 1992 U.S. Dist. LEXIS 7092, *7 (E.D. La 1992).

**ABSENCE OF PERIL RENDERS THE SERVICES A TOW**

The Court finds that in this matter there was no reasonable apprehension of peril to the vessel. The Court takes into consideration the extensive experience of the vessel occupants.  Mr. and Mrs. Pittman and Mr. Biggs have sailed across oceans and encountered significant weather far exceeding the conditions experienced on the Terry Leah on April 8, 2022.  After the vessel struck the sandbar, it continued to maneuver on a functional motor against the wind and currents. The Vessel anchored and remained there for over an hour without issue. The vessel never called for emergency assistance from the Coast Guard.  No one on board ever deemed it necessary for them to don lifejackets.  After the vessel was safely holding fast at anchor over 2200 feet from the shore, they called to Plaintiff to request a tow. Mr. and Mrs. Pittman were content to stay on board

overnight if necessary. Although Mr. Pittman had another boat and employee available to tow the Terry Leah using a vessel larger than the Plaintiff's towboat, it was far more convenient to have the boat towed by a company which agreed to offer such a service.

As in *Day-Petrano v. Vessel Mistress, supra,* the subject vessel was in no danger of sinking. No water was entering the vessel and there was no evidence that the boat was in a situation that required rescue or exposed it to loss or destruction. The vessel was not in peril. All that was required and requested was a tow for convenience sake not a rescue from danger.

> If the vessel has the situation under control such that there is no 'reasonable apprehension for her safety in the future if left to her own unaided efforts,' then there is an absence of peril. *The J.C. Pfluger,* 109 F. 93, 95-96 (N.D. Cal. 1901); *Neptune Maritime Co. of Monrovia v. Vessel Essi Camilla,* 562 F. Supp. 14, 25 (E.D. Va. 1982), aff'd 714 F.2d 132 (4th Cir. 1983); *Clifford v. M/V Islander,* 751 F.2d 1, 6 (1st Cir. 1984).

*Key Tow, Inc. v. M/V "Just J's",* 2005 U.S. Dist. LEXIS 31396, *29 ( S.D. Fla. 2005) (quoting *Fine v. Rockwood*, 895 F. Supp. 306, 309 (S.D. Fla. 1995).

## RIGHT TO REFUSE SALVAGE

However, even if peril (be it ever so slight) existed, it is axiomatic that a vessel owner must choose to accept salvage from a salvor - it cannot be forced upon the vessel.

> One well-established principle is that shipowners and masters have a right to refuse salvage assistance. The right to refuse salvage is a

firmly established right of vessel owners and masters: "under nearly
all supposable circumstances when the master is in command and
control of his own ship he may refuse and reject salvage services, and
no volunteer salvor can force on him, and be rewarded for, services
which he forbids." *The Indian*, 159 F. 20, 25 (5th Cir. 1908). This
Court has previously acknowledged the master's right to refuse
unwanted assistance. In *Hamburg- American Line v. United States*, we
noted that "salvage services may not be forced on the unwilling." 168
F.2d 47, 56 (1st Cir. 1948). This view is consistent with the Supreme
Court's statement that "salvage cannot be exacted for assistance forced
upon a ship." *Merritt & Chapman Derrick & Wrecking Co. v. United
States*, 274 U.S. 611, 613, 71 L. Ed. 1232, 47 S. Ct. 663 (1927). Other
cases strongly support this interpretation of salvage law as
well. *See New Harbor Protection Co. v. Steamer Charles P.
Chouteau*, 5 F. 463, 464 (D. La. 1881) (holding that a master has "a
perfect right to decline any assistance that may be offered him: he
should not be assisted against his will").

*Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 273-74 (1st Cir.
2003) (footnote omitted).

This principle is accepted and followed by the Eleventh Circuit which interprets

the law of salvage:

 to permit the owner of a vessel in marine peril to decline the
assistance of others so long as only the owner's property interests are
at stake. This view is consistent with the Supreme Court's statement in
*Merritt & Chapman* that "salvage cannot be exacted for assistance
forced upon a ship." 274 U.S. at 613, 47 S. Ct. at 664.

*International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked & Abandoned
Aircraft,* 218 F.3d 1255, 1262 (11th Cir. 2000).

In the instant matter Plaintiff never declared its intention claim salvage. The

record is clear the Defendants had called for a tow and were under the impression

the Plaintiff was operating under the verbal contract for tow it had entered into. To

be in a position to reject salvage services, the owner/captain must first be aware of the intent of the plaintiff to claim salvage.

The tow boat operator never raised the issue of salvage when it arrived where the vessel was anchored, while providing services, or prior to arrival at the marina. The owner was never provided the opportunity to reject salvage. The vessel and the vessel owner never agreed to salvage of the vessel and did not consent to the vessel being salved.

The vessel owner cannot be forced to accept salvage performed without its consent after the services were provided. "'Salvage cannot be forced upon an owner or his agent in possession of the vessel; a salvor who acts without the express or implied consent of the owner is a 'gratuitous intermeddler,' who is not entitled to any salvage award.' 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 16-1 (2d ed.1994)." *International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1262 (11th Cir. 2000).

As testified by Mr. Morgan and as consistent with the law, the salvor has an obligation to make clear to the vessel that its acts constitute salvage and that it intends to seek a salvage award for its actions. See, *Blue Water Marine Servs. v. M/Y Natalita, III*, 2010 U.S. Dist. LEXIS 30242, *6 (S.D. Fla. 2010). Plaintiff failed to satisfy this obligation.

If rejected the salvor must stand down. "'[P]otential salvors' do not have any inherent right to save distressed vessels. Their activities must be subject to the owner's acquiescence." *Jupiter Wreck, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 691 F. Supp. 1377, 1389 (S.D. Fla. 1988). There was no acquiescence to salvage in the instant matter.

**THE CLAIMED PERIL WAS DE MINIMUS**

As noted above, a "maritime peril does not exist where "the vessel has the situation under control such that there is no 'reasonable apprehension for her safety in the future if left to her own unaided efforts.'" *Fine v. Rockwood*, 895 F. Supp. 306, 309 (S.D. Fla. 1995) (quoting *The J.C. Pfluger,* 109 F. 93, 95-96 (N.D. Cal. 1901)." *Biscayne Towing & Salvage, Inc. v. M/Y Backstage*, 615 Fed. Appx. 608, 610(11th Cir. 2015).

The Court has found that under the totality of the circumstance there was no reasonable apprehension of peril to the vessel. Moreover, even if the Court were to have found the existence of peril, it would have found the claimed peril to the vessel was minimal at best and the salvage would be of the lowest order.

The vessel was safely anchored and had one working engine which would enable it to navigate. Neither the waves nor the winds presented a danger to the vessel given its size and equipment. The hull of the vessel was not breached, it was

not taking on water and it was not a hazard to navigation. If considered salvage the

actions of the Plaintiff were of the lowest order of salvage.

Although the Court has determined the services rendered to not constitute

salvage (and/or if the services were salvage the actions of the Plaintiff forfeits

recovery) Plaintiff failed to prove it is entitled to an award under *Blackwall.*

> To calculate the value of a successful salvage operation the court must
> consider the long-standing six-factor test established by the Supreme
> Court in *The Blackwall.* 77 U.S. at 14. The six factors, in order of
> their relative importance, are:
>   (1) The degree of danger from which the property was rescued;
>   (2) The value of the property saved;
>   (3) The risk incurred by the salvors in securing the property from
> the impending peril;
>   (4) The promptitude, skill and energy displayed [**12] in rendering
> the service and saving the property;
>   (5) The value of the property employed by the salvors in rendering
> the service and the danger to which such property was exposed; and
>   (6) The labor expended by the salvors in rendering the salvage
> service.
>
> Benedict § 237; *Treasure Salvors v. Unidentified, Wrecked and
> Abandoned Sailing Vessel*, 556 F. Supp. 1319, 1340 (S.D. Fla. 1983).
> A court must consider all six factors to determine the proper award,
> *B.V. Wijsmuller,* 702 F.2d at 340; however, the degree of danger from
> which the property was rescued tends to be the most important factor
> in determining the amount of the award.8 Benedict § 245*; Cobb Coin
> Co., Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 549
> F. Supp. 540 (S.D. Fla. 1982); Ocean Servs. Towing & Salvage, Inc.
> v. Brown, 810 F. Supp. 1258, 1263 (S.D. Fla. 1993); Conolly v. S.S.
> Karina II, 302 F. Supp. 675 (E.D.N.Y 1969).

The Court's analysis of the evidence as applied to the *Blackwall* factors reveals the

following:

- The degree of danger (Factor 1) was none.

- Although the value of the property was high (Factor 2), there is no competent evidence that the Terry Leah would have sustained damage had she slipped anchor.  The burden is upon the Plaintiff to prove what was saved through its actions. In this instance the Court is unpersuaded that the boat would have been damaged by ending up on a beach.  Plaintiff's own expert failed to present such a case. Mr. Starns did not support Lilly's statement that had the boat broken free that it would have ended up on a beach.  (T2 p.121 L13-19; T2 p.125 L14-17) Therefore, Plaintiff has failed to prove what was saved.  (*Biscaynh Towing & Salvage v. Kilo Alpha*, Ltd, 2004 U.S. Dist. LEXIS 27454, 2005 AMC 129(S.D. FLA.)

- The risk incurred by the Plaintiff (Factor 3) was self-induced.  The Court credits the unrebutted testimony of Captain Morgan that conditions were benign from a professional salvors perspective and the risk to Lilly was none other than self-induced peril.

- Factor 4.The promptitude was not noteworthy as Lilly arrived one hour and 10 minutes after the request for a tow was made. (T2 p.60 L6-12) The skill low as it was simply that of a tow. Lilly merely put a line on the Terry Leah and towed it.  The boat was not aground.  It was not necessary to dewater the boat, patch it or extinguish a fire.

- The value of the property employed by the Plaintiff was minimal and the danger to the property (Factor 5) was not greatly at risk had Lilly used the correct length of tow line. The tow boat's value was estimated between $80,000 and $90,000. (T2 p.18 L16-20).

- Finally, the labor expended by Lilly putting a line on the boat and towing it away from the anchorage (Factor 6) was limited to 37 minutes according to Mr. Paul. (T2 p. 60 L5-13)

Application of the *Blackwall* factors if Plaintiff had proven entitlement would result in a finding of the lowest order of salvage. The appropriate measure of damages for a low order salvage are those equivalent to a tow plus a small premium through the doctrine of quantum meruit. *Biscayne Towing & Salvage v. Kilo Alfa, Ltd*., No. 02-22644 CIV-MARTINEZ-KLEIN, 2004 U.S. Dist. LEXIS 27454, *9 (S.D. Fla. Sep. 30, 2004); *See also Key Tow, Inc. v. M/V "Just J's"*, 19 Fla. L. Weekly Fed. D 60 at *35 (U.S. S.D. Fla. 2005).

Quantum meruit is an equitable remedy requiring "clean hands." As more fully discussed below the Court the Plaintiff does not have clean hands and is therefore not entitled to the remedy of quantum meruit.

**PLAINTIFF'S OVER REACHING WARRANTS FORFITURE OF ANY AWARD**

The law is clear that "gross exaggeration….as to the extent of the service rendered and false testimony to support the same will justify a denial of any award for salvage, or a reduction of the amount thereof." See *Rodriguez v. Bagalini*, 17 F.2d 921, 923 (9th Cir. 1927). According to the Fifth Circuit Court of Appeals, "because of the heightened vulnerability of a distressed ship and crew to exploitation by salvors, 'the law cannot…tolerate salvors [sic] dishonesty, corruption, fraud, falsehood, either in rendering the service, or in their proceedings to recover the salvage.'" *Jackson Marine Corp. v. Blue Fox*, 845 F.2d 1307, 1309 (5th Cir. 1988).

In the instant matter the Plaintiff has grossly misrepresented the peril presented, the conditions of the seas, the situation the vessel was in and the services rendered. Contrary to the sworn assertions by Plaintiff in verified pleadings and discovery responses, the vessel was not grounded, Lilly mischaracterized wave height, his communications with the Defendant's vessel, the location of the vessel, and tried to persuade the Court the boat was simultaneously aground and the anchor dragging. The Plaintiff falsely swore that two employees were involved and sought compensation based on two employees when Lilly was alone on the boat. Lilly lied to the Court regarding the facts

surrounding the signature on the contract and forged the signature of the Mr. Biggs.

These falsehoods in both the verified pleadings and discovery responses as well as in deposition testimony and trial testimony warrant denial or forfeiture of any recovery.

Where a Salvor overreaches, exaggerates the scope of danger, or otherwise engage of acts of misconduct, this Court has the power to diminish the ultimate salvage award. *In Biscayne Towing & Salvage, Inc. v. Kilo Alfa, Ltd*., 2004 WL 3310573, *7, 2005 A.M.C. 129 (S.D. Fla. 2004); *Higgins Inc. v. The Tri-State*, 99 F.Supp. 694 (S.D.Fla.1951). *See also Rodriquez v. Baglini*, 17 F.2d 921 (9th Cir.1927) (reducing salvage award where salvor filed with court exaggerated

Plaintiff has forfeited its right to a salvage award and engaged in overreaching and fraud by exaggerating the services provided, sea and weather conditions, manpower and value of its services.   See, *Key Tow, Inc. v. M/V "Just J's",* 2005 U.S. Dist. LEXIS 31396, *31 (S.D. Fla. 2005)

**QUANTUM MERUIT**

Plaintiff's second or alternative action for Quantum Meruit is barred by law as a result of its behavior and actions.

"Quantum meruit is used as an equitable remedy to provide restitution for unjust enrichment." *Webster v. Royal Caribbean Cruises, Ltd.,* 124 F. Supp. 2d 1317, 1326 n. 9 (S.D. Fla. 2000) (citing Black's Law Dictionary 1255 (7th Ed.1999))

*Ramindesign, LLC v. Skarzynski,* 2024 U.S. Dist. LEXIS 118754, *19( S.D. Fla
2024)

It is a well established equitable maxim that:

> "he who comes into equity must come with clean hands." This maxim
> is far more than a mere banality. It is a self-imposed ordinance that
> closes the doors of a  [138] court of equity to one tainted with
> inequitableness or bad faith relative to the matter in which he seeks
> relief, however improper may have been the behavior of the
> defendant. That doctrine is rooted in the historical concept of court of
> equity as a vehicle for affirmatively enforcing the requirements of
> conscience and good faith. This presupposes a refusal on its part to be
> "the abettor of iniquity." *Bein* v. *Heath*, 6 How. 228,
> 247. [****16] Thus while "equity does not demand that its suitors
> shall have led blameless lives," *Loughran* v. *Loughran*, 292 U.S. 216,
> 229, as to other matters, it does require that they shall have acted
> fairly and  [*815] without fraud or deceit as to the controversy in
> issue. *Keystone Driller Co.* v. *General Excavator Co.*, 290 U.S. 240,
> 245; *Johnson* v. *Yellow Cab Co.*, 321 U.S. 383, 387; 2 Pomeroy,
> Equity Jurisprudence (5th Ed.) §§ 379-399.

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-815,
65 S. Ct. 993, 997, 89 L. Ed. 1381, 1386, 1945 U.S. LEXIS 2797, *15-16, 65
U.S.P.Q. (BNA) 133, 137-138 (1945)

This maxim remains the guiding principle in admiralty and precludes

recovery by Plaintiff in the instant matter.

## **COUNTERCLAIMS**

Defendants' counterclaims are premised upon fraud, bad faith, overreaching

and vexatious litigation. The Court finds these claims to be meritorious.

**FRAUD**

The Court finds Defendants have established that the contract relied upon by Plaintiff in its efforts to establish a right to salvage was fraudulently procured and unenforceable.

The credible evidence before the Court establishes that there was no verbal disclosure of the intent to claim salvage either when a tow was requested or when Lilly arrived at the scene. Mr. Lilly conceded he never notified the individuals on the vessel that the services were to constitute salvage This resulted in the Plaintiff's ultimate determination it was necessary for the Vessel to consent to salvage pursuant to a written contract The written contract was an effort to convert the tow to salvage after the fact.  However, the contract terms were not displayed or explained to the vessel owner or representative, the provisions were obscured and one of the two signatures on the document was a forgery.

 It is clear to this Court that the putative contract was procured by the Plaintiff's fraud and should be voided in its entirety.

It is a well-entrenched maritime principle that the Court's will not enforce a contract with the vessel that has been "corruptly entered into, or made under fraudulent representations, a clear mistake or suppression of important facts, in immediate danger to the ship, or under other circumstances amounting to

compulsion, or when their enforcement would be contrary to equity and good

conscience". *The Elfrida,* 172 U.S. 186, 192 (1898).

> the Supreme Court has made clear that it is appropriate to set aside a
> salvage contract if it was, "corruptly entered into, or made under
> fraudulent representations, a clear mistake or suppression of important
> facts, in immediate danger to the ship, or under other circumstances
> amounting to compulsion, or when their enforcement would be
> contrary to equity and good conscience." *The Elfrida*, 172 U.S. at 192,
> 19 S. Ct. 148. Here, the district court found specific conduct on the
> part of Blue Water that it considered to be "contrary to equity and
> good conscience." Nothing in the record convinces this court that the
> district court's findings were clearly erroneous. We conclude therefore
> that the district court committed no reversible error in deciding not to
> enforce the contract.

*Blue Water Marine Servs. v. M/Y Natalita III*, 2009 U.S. App. LEXIS 29119, *11

(11th Cir 2009)

As in *Blue Water Marine Servs. v. M/Y Natalita III*, 2009 U.S. App. LEXIS

29119 (11th Cir. 2009), Captain Lilly did not discuss or disclose the form salvage

contract until the tow was completed. Plaintiff did not disclose to the Defendants

that it intended to treat the situation as a salvage situation and that it would be

seeking compensation on that basis in accordance with general maritime law. This

constitutes fraud and bad faith on the part of the Plaintiff warranting forfeiture of

any award as well as assessment of attorney fees and costs against the Plaintiff.

*See, Blue Water Marine Servs.*, 2009 U.S. App. LEXIS at *6.

## BAD FAITH, OVER REACHING, VEXATIONS LITIGATION

The Court concludes the overreaching of Plaintiff and fraudulent statements by Lilly to create a peril where one did not exist are clear evidence of the bad faith vexatious intent to drag Defendants through unnecessary litigation. The overreaching/bad faith is patent. It started with the duplicitous execution of a contract after the tow was performed and completed and was followed by the call from Mr. Paul three days after the event announcing a demand of $500,000. The demand was not based on Blackwall factors but the mere fact the boat was high value with the supposition the owner could afford to pay.  The second bad faith / overreaching demand was raised in a salvage report which was premised upon the false statements of Lilly as to the vessel being grounded and the services performed in removing the vessel. This report demanded the Defendants pay $375,000 to prevent the arrest of the boat and avoid additional unnecessary expense. Under the duress of imminent seizure of the vessel, the owner capitulated by placing funds in an attorney trust account.

Lilly painted his efforts in heroic terms based upon supposed "facts" that did not withstand the crucible of cross examination or the evidence from the other witnesses, including the Plaintiff's own expert.

Lilly grossly misrepresented the conditions at the scene. He mischaracterized wave height, his communications with the Defendant's vessel,

the location of the vessel as only hundreds of feet from the beach when the boat was well offshore, and tried to persuade the Court the boat was simultaneously aground and the anchor dragging.  Most significant is the issue of the forged signature on the putative salvage contract which is the basis of this litigation.

Plaintiff's corporate representative admitted under oath that there were inaccuracies plead in the Verified Second Amended Complaint and Interrogatories. These inaccuracies were known to the Plaintiff before trial yet were never retracted until examination at trial. These inaccuracies and gross exaggerations are central to the Plaintiff's supposed attempt to establish a salvage claim.

> Bad faith exists when the court finds "that a fraud has been practiced upon it, or that the very temple of justice has been defiled." Id. at 46 (citations omitted). Further, a finding of bad faith is warranted where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, [**43]  or hampers enforcement of a court order. *Thomas v. Tenneco Packaging Co.,* 293 F.3d 1306, 1320 (11th Cir. 2002*); Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993). In admiralty cases, courts have considered "the necessity for the litigation and the trial upon the issues raised," and have awarded fees where "it was clear that the defendants had little, if any, basis for disputing the salvage award," but brought the case to trial anyway. *Southernmost Marine Servs. v. M/V Potential*, 250 F. Supp .2d 1367, 1380-81 (S.D. Fla. 2003). Nonetheless, the bad faith inquiry is primarily focused "'on the conduct and motive of a party, rather than on the validity of the case.'" *Esoteric, LLC v. One (1) 2000 Eighty-Five Foot Azimut Motor Yacht Named M/V STAR ONE,* 478 F. App'x 639, 643 (11th Cir. 2012) (per curiam) (quoting *Rothenberg v. Sec. Mgmt. Co*., 736 F.2d 1470, 1472 (11th Cir.1984)).

*JSM Marine LLC v. Gaughf,* 407 F. Supp. 3d 1358, 1379(S.D. Ga. 2019)

The actions of Lilly and Plaintiff's representative demonstrate a pervasive path of fraud and deceit and clearly demonstrates the litigation was not filed or maintained in good faith when Defendant was willing to pay for the value of the tow as contracted. Plaintiff has forfeited its right to a salvage award and engaged in overreaching and fraud by exaggerating the services provided, sea and weather conditions, manpower and value of its services.   See, *Key Tow, Inc. v. M/V "Just J's"*, 2005 U.S. Dist. LEXIS 31396, *31 (S.D. Fla. 2005)

> [a]t the trial, the Court found that the plaintiff did not discuss or disclose the form salvage contract agreement until after the vessel was already towed off the reef. (Trial Tr. 23) Furthermore, the Court found that the Plaintiff did not discuss or disclose to the Natalita Defendants that it intended to treat the situation as a pure salvage situation and that it would be seeking compensation in accordance with general maritime law. (Trial Tr. 23.)
>
> Id. Pursuant to this finding of bad faith, the Court concluded that the Natalita Defendants are "entitled to an award of attorneys' fees and costs for the litigation that proceeded after the date of the first offer of judgment.

*Blue Water Marine Servs. v. M/Y Natalita, III*, 2010 U.S. Dist. LEXIS 30242, *6 (S.D. Fla. 2010)

The actions of the Plaintiff in the litigation constitute vexatious conduct warranting the imposition of damages and attorney's fees to reimburse the defendant for the cost of the unnecessary litigation.

**CONCLUSION**

Plaintiff has failed to establish a salvage event entitling it to an award by the Court.   Plaintiff's actions were a tow not salvage.   In addition, Plaintiff by its

overreaching, fraud and deceit has forfeited any entitlement to an award for its actions.

Defendants have established that they were fraudulently induced to sign the purported salvage agreement, and that Plaintiff engaged in bad faith and vexatious litigation entitling them to an award of damages for loss of use of the funds deposited in escrow to avoid the wrongful arrest of the vessel and attorney fees and costs to be determined by the court after entry of judgment.