UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARINE TOWING & SALVAGE
OF S.W. FL., INC.,

      Plaintiff,

v.                         Case No.:  2:22-cv-346-SPC-KCD

ONE 66' 2019 SABRE DIRIGO,
MONTE BRIGGS, and EYRIE
HOLDINGS, LLC,

      Defendants.

_____/

## OPINION AND ORDER

The Court heard testimony and argument during a three-day bench trial. The parties have since provided their Proposed Findings of Fact and Conclusions of Law. (Docs. 101, 102). The Court having reviewed the parties' filings and considered the evidence before it reaches these findings of fact and conclusions of law:

## FINDINGS OF FACT

On April 8, 2022, the 66' 2019 SABRE DIRIGO, known as the M/V TERRY LEAH, aka M/V WHIRLAWAY left Tarpon Point Marina, Cape Coral for an afternoon cruise with Randall Pittman as captain, Monty Biggs as a deck hand, and Mary Pittman as a passenger. The intended itinerary was to

sail around Estero Island and return to Tarpon Point Marina.  (Doc. 95 at 159-60

The people on board the boat were all experienced sailors.  Mr. Pittman sailed his entire life in boats ranging from 12 to 143 feet.  He raced sailboats competitively for 40 years across the ocean and sailed in the Great Lakes, East, and West Coasts, Mediterranean, England, Galapagos, Australia, and New Zealand.  He currently owns various boats, including a 125-foot yacht. (Doc. 95 at 156-57).

On that day, Monty Biggs was acting as deckhand on the boat but holds a 200-ton United States Coast Guard Master's license with sailing and towing endorsements.  He is senior captain of Mr. Pittman's 125-foot yacht and has captained yachts on the east coast, Pacific Northwest, Bahamas, and Caribbean.  He is experienced in heavy seas and bad weather.  While sailing the transatlantic he encountered seas of 20 to 25 feet.  (Doc. 96 at 58-59, 61).

Mrs. Pittman was experienced in competitive sailboat racing in the Pacific Northwest.  She is experienced in cruising on powerboats on the East Coast, Pacific Northwest, and Mediterranean.  She and her husband sailed a smaller version of the boat on a 3000-mile voyage called the Great Loop from Cape Coral across Okeechobee, up the east coast to the Hudson River, across the Erie Canal, around the Great Lakes, down the Illinois River, down the

Mississippi River, to Mobile, Alabama, and down the Gulf coast all the way back to Cape Coral.  (Doc. 95 at 156-57; Doc. 96 at 118-19).

April 8th was a good day for cruising, according to those on board, with the weather mostly clear and a 15-mph wind blowing from the north/northwest.  Winds this speed did not present a challenge.  A small craft warning was posted but had no impact on the 66' Terry Leah.  (Doc. 95 at 25-26, 177; Doc. 96 at 28, 61, 119).

The seas varied, with waves up to two and a half feet.  Mrs. Pittman described the cruise as a smooth ride.  Although there was a little cloud cover and some waves, the boat had a Seakeeper, which helped with the waves.  On other occasions, the Pittmans had experienced eight-foot waves or higher in the 48-foot version of the boat without feeling in peril.  (Doc. 96 at 29-30, 60, 119).

It was smooth sailing until the boat ran over a sand bar at Big Carlos Pass.  The boat was not traveling fast when it hit the sandbar - Biggs and Mr. Pittman described feeling a "bump."  Mrs. Pittman did not recall feeling anything.  Biggs checked the engine room and confirmed no water was entering the boat.  Although no one knew the exact nature of the damage then, a later examination of the boat revealed that the boat's hull never touched the sandbar.  Rather, the tips of the boat's two propellers had gone

through the sand, damaging the starboard propeller.  (Doc. 95 at 191-92; Doc. 96 at 43-45, 63-64, 120).

Despite running over the sand bar, Mr. Pittman could maneuver the boat on the port engine.  He testified that he steered the boat in different directions.  The GPS data showed that the boat accelerated using the port engine.  After passing over the sandbar, the boat got up to a speed of around five knots.  Mr. Pittman kept the boat heading into the wind to drop the anchor.  Defendants' expert witness Captain Timothy Morgan testified that the GPS datapoint "breadcrumbs" demonstrate Mr. Pittman had control of the vessel as the turns depicted on the GPS data would not have been otherwise possible.  Plaintiff's expert witness Robert Starns disagreed. Considering the credible testimony from those on board, the GPS data, and Morgan's testimony, the Court finds that Mr. Pittman could maneuver the boat after hitting the sandbar.    (Doc. 95 at 238; Doc. 96 at 14-17, 63-64, 66, 121, 163-64).

After Mr. Pittman determined that the starboard engine was inoperable, he dropped the anchor to determine what to do next.  Even Plaintiff's expert, Starns, confirmed the decision to anchor was a prudent move of a prudent mariner.  (Doc. 95 at 113-24; Doc. 96 at 64).

Biggs described the process of deploying the 100-pound anchor.  At the time, two to two and half foot waves were hitting the bow.  Biggs could stand

while deploying the anchor, as was standard practice. It was not necessary to hold onto the railing and he did not wear a life jacket as the conditions did not warrant it. (Doc. 96 at 65-68).

While anchored, there was five feet of water under the bottom of the boat. Given the boat's draft, it was in ten feet of water. The boat was not grounded and was not hitting bottom while sitting at anchor. The boat never touched the bottom again that day after running over the sand bar. (Doc. 95 at 194; Doc. 96 at 23, 73).

The experts disagreed somewhat about the wind speeds at anchor. But they agreed the wind was coming from the north/northwest. Given the shape of Florida's southwest coast, the wind would have blown the boat parallel or away from the beach, not toward the beach. (Doc. 96 at 25-26, 147-48).

Mr. Pittman testified the wave conditions while anchored were one to two feet. Defendants' expert viewed an image of the boat while at anchor, compared marks on the side of the boat, and opined that the wave striking the boat was one and a half to two feet. And the images speak for themselves—it was a choppy day, but the waves were not large. (Doc. 96 at 26, 146).

The anchor alarm, which lets the crew know if the boat is drifting or dragging the anchor, was turned on and never tripped. The anchor was holding. Defendants' expert analyzed the boat's GPS data and found no

evidence that the anchor was dragging. The evidence suggests that the boat
was swinging on its anchor. Plaintiff's expert agreed no evidence showed the
boat was dragging its anchor. (Doc. 95 at 111-12; Doc. 96 at 12, 24, 68, 154).

While safely anchored, Biggs and Mr. Pittman discussed whether to
return home with the port engine or call for a tow. They called for a tow.
(Doc. 95 at 188-89; Doc. 96 at 68).

Biggs then called TowBoat US. Dispatcher Tonya Morris was on the
other end of the call. What they said during this and later calls was disputed
at trial and remains murky. Morris never mentioned that TowBoat US may
consider this a salvage event. She testified that Biggs was frantic and said
the boat was blowing toward the beach. Biggs could not remember the exact
words but testified that he was not frantic and never said the boat was
blowing toward the beach. The Court credits Biggs' version of events. Biggs'
testimony was more consistent with other objective evidence in the record
and thus the Court finds him to be credible. (Doc. 94 at 35, 48; Doc. 96 at 68-
72, 104).

Did the individuals on board the boat perceive any peril to themselves,
each other, or the boat? Mr. Pittman did not believe they were in peril. As
captain, he was responsible for the safety of those on board and would have
ordered the passengers to wear life jackets if they were in peril. On that day,
he determined there was no reason to don life jackets and did not order Mrs.

Pittman or Biggs to don them because he did not feel it was necessary. (Doc. 96 at 8, 21).

Mrs. Pittman walked around in the salon without difficulty while at anchor; she walked around the boat and went downstairs to the lavatory; and she read her book comfortably in the bridge area. She would have put on a life jacket if she felt she was in danger. There was nothing different about that day compared to other times that she had been on an anchored boat. According to Mrs. Pittman no one was frantic or upset. (Doc. 96 at 121-24).

Biggs did not consider either himself or the boat in peril. The seas and weather did not warrant it. Biggs never wore a life jacket during the event even when working on the bow. He never saw anyone on board wearing a life jacket. (Doc. 96 at 73-75).

Defendants' expert, with his experience in the commercial towing and salvage business, testified that the conditions that day would not have risen to the level of peril. The boat was safely moored, and the anchor was holding fast. Wind conditions weren't unusual, and the seas weren't large. According to him, it was a "pretty benign day." (Doc. 96 at 141-42, 171).

Plaintiff dispatched Towboat Captain Stephen Lilly to respond to Defendants' call. He arrived one hour and ten minutes after the call was placed. (Doc. 95 at 61).

Upon arriving on scene, Lilly communicated with Biggs by phone and voice. Contrary to Lilly's testimony, Mr. Pittman had no radio or telephonic contact with Lilly. Biggs confirmed Mr. Pittman's testimony, stating he never heard Pittman talking with Lilly while at anchor. (Doc. 96 at 10, 106, 112).

Lilly never mentioned the term salvage while at anchor. Mrs. Pittman never heard the term salvage while on board the boat. Lilly admits he never disclosed to the people on the boat that he considered his services as salvage. (Doc. 94 at 170-71; Doc. 96 at 21, 74-76, 124).

Mr. Pittman testified that if he were told salvage would be claimed he would have looked for an alternative plan. He would have called another licensed captain employee or navigated the boat under her own power. He had a boat larger than the tow boat available to tow. (Doc. 95 at 238-39; Doc. 96 at 21).

Lilly proceeded to throw Biggs a line. Defendants' expert's assessment of the services provided was that of a simple tow. It was what he would do on any given day. "You go out there; you pass a tow bridle to the disabled vessel. You pull it up over their anchor line. You let them retrieve their anchor, and then you go on your way." (Doc. 96 at 171).

The only out-of-the-ordinary thing about the tow was that Defendants lost their anchor.  Lilly tried to tow the boat to retrieve the anchor twice before deciding to abandon it.  (Doc. 96 at 114, 178).

Evidence was adduced at trial that Plaintiff's own missteps led to the decision to abandon the anchor.  Defendants' expert testified that Lilly's use of 350 feet of tow line was inappropriate.  According to him, Lilly would have been able to successfully pull the boat forward over the chain and anchor had he used 50 feet of tow line.  Given the amount of line used, it was nearly impossible for Lilly to control the boat to bring it up over the chain.  He also noted that Lilly's towboat may have been ill-equipped for the choppy conditions.  It was a 26-foot, landing craft-type boat with a flat bottom and bow.  Defendants's expert questioned Lilly's experience and was unsurprised that he struggled to tow the boat given the length of line and the towboat used.  (Doc. 96 at 157-61, 170).

Defendants' expert's assessment of Lilly was bolstered by the testimony of Biggs, an experienced captain with a towing endorsement on his 200-ton license.  Biggs observed Lilly had a lot of tow line out, much more than necessary.  Further, pulling the boat forward would only pull them across the sandbar they first hit.  Biggs felt the way Lilly was trying to tow the boat was setting up a tug-of-war between him and the windlass.  (Doc. 96 at 58-59, 108, 11).

Aside from losing the anchor, however, the tow was a success.  The boat was returned to safe harbor.  Upon arrival at the dock, Lilly came on board to inspect.  A quart of water was in the bilge, but the water was not coming into the boat because of the sandbar collision.  Biggs never told Lilly the boat had taken on water because of the sandbar.  Rather, the small amount of water in the bilge was from Biggs removing and cleaning a strainer basket before the cruise.  This regular maintenance always resulted in a small amount of sea water in the bilge.  (Doc. 96 at 77-79).

The first time Mr. Pittman spoke with Lilly was at the dock.  Lilly never mentioned salvage or asked him to sign a salvage agreement.  Lilly watched the Pittmans leave and did not call to Mr. Pittman to ask him to come back.  Shortly after the Pittmans left, Lilly got into his boat and left. He returned with an iPad.  (Doc. 95 at 246; Doc. 96 at 21-22, 80-81).  Back at the dock, Lilly told Biggs "I need to get you to sign this delivery receipt.  It just simply states that we brought you to the dock safely.  If you could sign." Biggs signed and requested a copy of what he signed.  In response, Lilly turned around and, in an agitated, raised, and threatening voice, said, "So now you're calling me a liar."  Lilly got into his boat and left.

Biggs never received a copy of the document, later identified as a salvage contract.  Biggs never had an opportunity to see the document's first page as Lilly held the iPad and displayed only the signature line.  Biggs was

never directed to look at the first page that contained the heading "Marine
Salvage Contract." (Doc. 96 at 82-83).

Under the signature line on the salvage contract produced at trial,
Biggs' name was misspelled "Monte Briggs" instead of "Monty Biggs."  If
Biggs' misspelled name on the signature line was present when Biggs signed,
he would have said something.  Biggs did not see his name printed on the
document he signed.  And the contract produced at trial contains two
signatures.  Only the top signature is Biggs'.  Biggs testified that the second
signature at the bottom of the document is not his.  Biggs has a condition
called familial tremors.  It affects his voice and hands.  According to Biggs the
bottom signature could not be his because the tremors would not permit the
smooth loops on the second signature.  (Doc. 96 at 60, 83-85).

The Court had the opportunity to observe Biggs during the several-day
trial, specifically when he testified and reviewed the signatures.  The Court
determines that the second signature is not Biggs'.

## CONCLUSIONS OF LAW

Having made its findings of fact, the Court now considers Plaintiff's
salvage claim.  Plaintiff brings a pure salvage claim.  (Doc. 102 at 22).  To
establish a claim for pure salvage, Plaintiff must show by a preponderance of
the evidence (1) marine peril, (2) voluntary service not required by an
existing duty, and (3) success in whole or in part.  *Girard v. M/V*

*'Blacksheep'*, 840 F.3d 1351, 1354 (11th Cir. 2016) (citing *The SABINE*, 101 U.S. 384 (1879)). Because Plaintiff has failed to prove marine peril, its pure salvage claim fails.

Courts have found marine peril when a boat is hard aground, taking on water, or at the mercy of the sea because of lack of power. *See Fine v. Rockwood*, 895 F. Supp. 306, 309 (S.D. Fla. 1995) (collecting cases). No marine peril exists if the boat "has the situation under control such that there is no reasonable apprehension for her safety in the future if left to her own unaided efforts." *Biscayne Towing & Salvage, Inc. v. M/Y Backstage*, 615 F. App'x 608, 610 (11th Cir. 2015) (cleaned up). A plaintiff need not show, however, that the boat could not have been rescued without the salvor's assistance. *See Girard*, 840 F.3d at 1355. "To constitute a maritime peril, the danger need not be imminent, but only reasonably apprehended." *Reliable Salvage & Towing, Inc. v. 35' Sea Ray*, No. 2:09-CV-329-FTM, 2011 WL 1058863, at *7 (M.D. Fla. Mar. 21, 2011).

The evidence offered at trial shows there was no marine peril or reasonable apprehension of marine peril. This is not a case where the boat was hard aground when Plaintiff arrived to render assistance. Nor was the boat taking on water or at the mercy of the sea.

The occupants were on a leisure cruise in a large boat. While the sea was choppy, the weather and sea conditions did not pose a danger to the boat

or those on board.  Although the boat then ran over a sandbar, it was not
moving fast, and those on board felt only a bump.  The boat could accelerate
and maneuver after running over the sandbar, and no water was entering the
boat.  Far from the beach, Defendants dropped anchor while they assessed
the situation.  The anchor set and held and did not blow the boat toward the
beach.  Mr. Pittman and Biggs decided that the prudent plan was to call for a
tow rather than navigate on one engine or contact another employee for
assistance.

What was said during the phone call is unclear, but the occupants had
no reason to be frantic.  Captain Lilly took over an hour to respond and when
he arrived, the occupants were not wearing lifejackets, and the boat was
floating freely on its anchor.  Lilly's efforts can be fairly summarized as
simply throwing the boat a line and pulling it back to the dock after a few
attempts.

Plaintiff failed to prove its story of peril (high winds, rough seas,
treacherous shoals, a completely disabled boat, frantic occupants, and a
nearby, downwind beach).  At bottom, Plaintiff relied almost exclusively on
Lilly's exaggerated version of events to support a finding of peril.  His
testimony contradicts nearly all other evidence—the credible testimony from
those on board, the GPS data, Lilly's own images, Defendants' expert

testimony, and much of Plaintiff's expert testimony—support a finding of no peril and no reasonable apprehension of peril.

Plaintiff emphasizes that Defendant abandoned its anchor to assist with the tow. According to Plaintiff, the anchor was the only thing holding the boat from blowing onto the beach. If those on board abandoned the anchor, so the argument goes, they must have been desperate. This argument is nonsense because the offshore wind would have blown the boat down the coastline and further from shore, not onto the beach. The argument doesn't have much logic behind it either. If those on board feared blowing onto the beach, why would they abandon their anchor and depend solely on a towboat operator who had already twice bungled the tow? The more plausible explanation is that they were willing to drop the anchor because there wasn't much risk in doing so—the boat was not blowing toward the beach, and Mr. Pittman could have maneuvered the boat if the need arose. There simply was no peril or reasonable apprehension of peril.

Second, Plaintiff's other claims fair no better. Plaintiff failed to mention Quantum Meruit or Maritime Lien during its arguments at trial or anywhere in its post-trial findings of fact and conclusions of law. Thus, Plaintiff has abandoned those counts. *See, e.g.*, *Elmore v. Ne. Fla. Credit Bureau, Inc.*, No. 3:10-CV-573-J-37JBT, 2011 WL 4480419, at *1 (M.D. Fla. Sept. 27, 2011) (finding abandoned a claim "not raised . . . in either the joint

pretrial statement, the proposed findings of law, or during trial"); *Devs. Sur. & Indem. Co. v. Roofing*, No. 3:15-CV-655-J-34PDB, 2017 WL 2350280, at *2 (M.D. Fla. May 31, 2017) (finding because the plaintiff pursued only one of the three counts during a bench trial the other two counts were abandoned).

Third, the Court finds that Defendants are entitled to recover their attorney's fees and costs.   They bring counterclaims for Fraudulent Inducement (Count I) and Fraud, Bad Faith, Overreaching, and Vexatious Litigation (Count II).  (Doc. 12 at 6-16).  Through these counterclaims, they seek "an award of damages for loss of use of the funds deposited in escrow to avoid the wrongful arrest of the vessel and attorney fees and costs to be determined by the court after entry of judgment." (Doc. 101 at 62).  But they never presented their claim for damages during the bench trial or developed that claim in their post-trial brief, so they have forfeited the right to seek damages related to their funds being held in escrow.   It appears Defendants/Counterclaimants pursued the counterclaims primarily as a fee-shifting mechanism to obtain an award of attorney's fees and costs.   Fee-shifting is warranted here.

Generally, "[t]he prevailing party in an admiralty case is not entitled to recover its attorneys' fees as a matter of course."  *Misener Marine Const., Inc. v. Norfolk Dredging Co.*, 594 F.3d 832, 838 (11th Cir. 2010) (citation omitted). A court may award attorney's fees in an admiralty dispute, however, if the

non-prevailing party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Esoteric, LLC v. One (1) 2000 Eighty-Five Foot Azimut Motor Yacht*, 478 F. App'x 639, 643 (11th Cir. 2010) (*quoting Chambers v. NASCO*, 501 U.S. 32, 54 (1991)); *see also Misener Marine Construction Inc.*, 594 F.3d at 838. "Bad faith exists when the court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Dolphin Cove Inn, Inc. v. Vessel Olymplc Javelin*, No. 3:19-CV-1018-J-34JRK, 2020 WL 8461570, at *9 (M.D. Fla. Dec. 22, 2020) (cleaned up), *report and recommendation adopted,* 2021 WL 118871 (Jan. 13, 2021). The party arguing bad faith must meet a high burden to recover attorney's fees. *Fattorusso v. Hass*, No. 2:10-CV-201-FTM-SPC, 2012 WL 4356809, at *2 (M.D. Fla. Sept. 24, 2012).

Defendants/Counterclaimants have sufficiently shown that Plaintiff litigated this action in bad faith by pointing to pre-suit overreaching by Plaintiff, Plaintiff's misrepresentations in the complaint and discovery responses, and Plaintiff's frivolous arguments made at trial.

Three days after the event, Biggs received a call from Plaintiff's owner Rich Paul stating he was requesting $500,000 for the services provided on April 8, 2022. This was the first time Biggs heard the services were being

considered a salvage event.  The initial demand of $500,000 by Paul was chosen by merely picking the number out of the air and was not based on any science or *Blackwall* factors.  This initial demand was the first in a series of overreaching events.  (Doc. 94 at 72; Doc. 95 at 27; Doc. 96 at 232-33).

The second demand was the April 14, 2022, request for $375,000 security in lieu of arrest.  This demand falsely and repeatedly stated that the boat was aground when Plaintiff arrived.  In compliance with the demand, a letter of undertaking was issued.  Mr. Pittman deposited the $375,000 into a trust account to prevent the arrest of the boat.  (Exhibits J4, J52).

The Second Amended Complaint filed June 29, 2022, was verified under oath by Paul.  The verification states that he read the complaint, is familiar with the contents, and his information is "based on personal, first-hand knowledge of the events described in the Complaint, and that the same is true and correct."  Contrary to the oath, Paul did not have firsthand knowledge of the events.  His knowledge was obtained by hearsay from his dispatcher and Lilly.  The content of the verified Second Amended Complaint was Paul's impression of events.  (Exhibit J65 at 17; Doc. 95 at 49-50).

Plaintiff's corporate representative admitted that various paragraphs of the complaint have no factual basis.  Paragraph 13 represents the boat "was sitting on a sandbar."  Plaintiff testified that "I don't know if it was sitting on a sandbar or not."  (Doc. 95 at 50).  It was not sitting on a sandbar.

Paragraph 14 recites that the boat "was in a heavy surf area on a sandbar and violently bouncing off of the bottom." Plaintiff acknowledged "since then we've learned that's not true." But Plaintiff went forward at trial asserting the boat may have been hitting the bottom. (Doc. 95 at 51).

Paragraph 15 similarly states the boat was grounded at that time. At trial Plaintiff minced words asserting the boat was "in a grounded situation. It wasn't sitting on the bottom." The terms "grounded situation" and "grounded position" were a method to deflect factually incorrect statements that the boat was grounded.

Paragraph 17 states the boat "was in danger of capsizing." The boat was not in danger of capsizing and such a claim is ridiculous. (Doc. 95 at 54; Doc. 96 at 27).

Paragraph 18 states again that the boat was grounded and the towboat "successfully pull[ed] the Vessel off of the sandbar and release[ed] the Vessel from its ground position." Paul conceded he did not know whether the boat was grounded. (Doc. 95 at 32). Again, it was not.

The Court finds the Second Amended Complaint riddled with factual inaccuracies. Worse, Plaintiff proceeded to trial and forced Defendants to defend against the Second Amended Complaint knowing that many of its allegations were false.

The interrogatory's answers submitted by Plaintiff continued to recite facts that had no evidentiary support.    The answer to interrogatory 12 represents "Captain Lilly made three attempts to unground the vessel."  This response was defended by Paul repeatedly stating the boat was in a "grounded situation" rather than admitting the obvious fact the boat was never aground while at anchor.  (Exhibit J82; Doc. 95 at 59-60).

The answer to interrogatory 16 represents "a verbal agreement was made between the parties at the scene and a conforming written contract was signed in safe harbor."  This never happened at the scene.  Yet at trial Paul doubled down on this interrogatory, stating again that an unwritten agreement was made.  (Exhibit J82; Doc. 94 at 170-71, 174; Doc. 95 at 62; Doc. 96 at 20-21, 76, 124).

Interrogatory 21 requested Plaintiff "Identify all employees and staff of Plaintiff that were involved with rendering services to Defendants on April 8, 2022, specifying the total time expended by each person."    Plaintiff responded, "Captain Lilly and Ryan Hennecy were the only employees involved in physically providing service to the vessel in peril, and they each spent approximately 5 hours and 50 minutes time from dispatch to return to base."  At trial, Plaintiff admitted this response was a misstatement.  Paul retracted the claim for Hennecy stating he had only contributed two and a half hours after the tow was already underway.  This fact was known to

Plaintiff from day one, but Plaintiff only retracted the claim at trial. (Exhibit J82; Doc. 95 at 63).

Even during trial Plaintiff continued to intentionally exaggerate the conditions present on April 8th, 2022. Plaintiff's case relied almost entirely on Lilly's evasive and hyperbolic testimony.

Lilly would not commit to whether the boat was aground. Instead, he testified that the vessel was in a "grounded position." A grounded position, according to Lilly, meant "it could possibly be on the bottom, off the bottom, or near the bottom at a period." Lilly avoided stating what the actual condition of the vessel was in when he was attempting to provide a tow. (Doc. 194 at 177-81).

Lilly knew the boat was not aground and was floating freely on its anchor. In his written report, Lilly wrote "vessel holding 5.5-foot draft and 4 to 6 feet of water under Terry Leah." This contemporaneous statement matches Mr. Pittman's testimony the boat was in ten feet of water, with five feet under the hull. When confronted with the contradiction, Lilly testified that he meant to say it was four to six feet down from the waterline of the vessel. He clarified, "under, under, waterline, what not. What different—who knows? I was—I just had a baby. I was starting a new company. I was in the middle—I might have—who knows?" (Doc. 94 at 214-15; Doc. 96 at 23-

24).  This was not credible—Lilly knew the boat was not aground but didn't want to say so because it weakened the salvage claim.

Lilly also stated that people on board called him frantically stating the anchor was dragging and that they would end up on the beach.  Lilly testified that he viewed the GPS data after the incident and saw evidence of dragging.  Despite Lilly's testimony that the anchor was dragging, he simultaneously admits that he could not pull the boat because the anchor was set.  (Doc. 94 at 71, 160, 172-73).

All credible evidence shows the anchor was not dragging.  Those on board stated that the anchor was not dragging.  The anchor alarm was turned on and never tripped.  Defendants' expert analyzed the GPS data and found no evidence from the GPS the anchor was dragging.   Plaintiff's expert agreed there is no evidence that showed the boat was dragging its anchor.  The boat was not dragging the anchor.  (Doc. 95 at 111-12; Doc. 96 at 12-13, 154).

To manufacture peril, Lilly testified that the winds were blowing on shore and that the boat would end up on the beach but for his efforts.  This blown-ashore theory was perhaps Plaintiff's primary theory for peril, and it was frivolous.  The wind was coming from the north/northwest.  According to Defendants' expert, the wind would have blown the boat south/southeast and farther away from the beach.  This view was confirmed by Plaintiff's expert.

It was impossible for the wind to push the boat onto the beach.  (Doc. 94 at 97; Doc. 95 at 125, 201-02; Doc. 96 at 147, 153, 169).

Lilly's deposition testimony differed greatly from his trial testimony about the wind direction.  At deposition, Lilly repeatedly testified the wind was coming from the northeast, not the north/northwest.  Wind from this direction would have blown the boat even farther away from the beach.  But Lilly testified that he misspoke at his deposition.  He confusingly explained: "So I live in North Carolina; right?  And a northeast wind is kind of the same thing as a northwest wind in Southwest Florida."  (Doc. 94 at 147-50).

Lilly also said he felt that the boat was only a hundred or two hundred feet from the shore.  Closer to shore, after all, means closer to peril.  Yet the parties' experts placed the boat at 4/10 of a mile and 2,200 feet of shore.  GPS data presented during the trial confirms this.  The boat was not in a surf or breaker line near the beach.  It wasn't even close.  This was just more made-up peril.  (Exhibit J3; Doc. 94 at 155; Doc. 95 at 122; Doc. 96 at 22-23).

Lilly testified that those on board were wearing life jackets.  Life jackets suggest peril.  But his wandering testimony about life jackets was full of contradictions much like his other testimony.  At times, Lilly couldn't recall whether three occupants were wearing life jackets or just one or two.  Lilly stated he "knows" at least one person was wearing a life jacket.  But Lilly couldn't recall if Biggs (the person standing on the bow) was wearing a

life jacket.  This shaky testimony was contrary to the credible testimony from those on board.  No one was wearing a life jacket.  (Doc. 94 at 85-86, 100, 151-53, 160, 183-84).

Lilly also exaggerated the wave heights.  Lilly told Paul the seas were four to six feet with an occasional eight-foot wave.  When confronted with an image of the boat at anchor, Lilly's testimony became less clear.  (Doc. 94 at 158-63).

Mr. Pittman testified the waves were about a foot.  Biggs—having stood on the bow without a lifejacket while deploying the anchor—estimated the waves hitting the bow at two to two and a half feet.  Defense expert viewed images of the conditions and testified the boat was experiencing a one-to-two-foot surface chop.  Having heard the credible testimony from those on board, their expert, and reviewing the images admitted, the Court finds no evidence of waves that are the height Lilly claims.  (Doc. 94 at 163, Doc. 95 at 41; Doc. 96 at 41, 66-67, 146, 190-91).

The way Lilly documented the sea conditions further casts doubt on his version of the events that day.  According to Lilly, the first thing he did on scene was "snap a picture of the boat."  But many images from that day are not photographs, but screenshots taken from a video.   Lilly's text to Paul reveals what was going on: "I've got video, and I'm trying to still-shot the best ones."  He was cherry-picking images that showed the worst conditions.  Lilly

now says he lost the video.  But even Lilly's "best" images showing the worst conditions are unimpressive.  (Exhibit J50; Doc. 94 at 74, 208-11; Doc. 96 at 189-90).

Counsel asked Mr. Pittman whether "the conditions that were described by Mr. Lilly bear any resemblance to what you saw that day?"  He responded "no."  Similarly, Mrs. Pittman testified "This was the first opportunity I had to hear Mr. Lilly's side of the story here in the courtroom.  I don't think I was on that boat that he was describing.  It was a very different scenario of what I participated in."  (Doc. 96 at 30, 124).

Lilly's testimony about what happened back at the dock lacked credibility as well.  Lilly testified that Biggs took him into the engine compartment and pointed out where the water was coming in.  Lilly continuously repeated his contention that the boat had water coming into its hull.  But Biggs checked the engine room immediately after hitting the sand bar, and there was no water coming in.  Biggs described the water in the bilge as measuring about a quart.  That small amount of water resulted from maintenance, not hitting the sandbar.  The Court has viewed the photos of the bilge, the small amount of water is barely visible.  The boat never took on water, and Biggs never told Lilly that it did.  (Doc. 94 at 104, 127; Doc. 96 at 63-64, 77).

Next, Lilly claimed that the Pittmans left immediately after the boat returned to dock "almost like they [were] leaving the scene of a crime or something." Lilly testified he did not follow them through the gate as he was afraid he would have been locked out of the marina. Lilly testified that he may have called out to Mr. Pittman when he was leaving but couldn't remember. But Biggs testified Mr. Pittman was on the boat for about 20 to 25 minutes before leaving. And Lilly's testimony about the locked gate did not make sense because Biggs could have walked to the gate and opened it for him. The Court credits Biggs and the Pittmans' version of events. (Doc. 94 at 79, 81, 106, 184, 194-95).

Lilly also falsely claimed multiple times that Paul was on the phone with Biggs while the three discussed the events and the salvage contract. Yet Lilly could provide no detail about any of the contents of the conversation. When confronted with Paul's deposition testimony that Paul only spoke with Biggs three days later, Lilly disregarded it and insisted that Paul was on the phone. Paul and Biggs' trial testimony confirmed that their first conversation occurred the Monday after the event. (Doc. 94 at 185-87; Doc. 95 at 26).

Finally, the purported contract is just as questionable as the rest of Plaintiff's evidence. Lilly misrepresented the nature of the document to Biggs and held the iPad as Biggs signed. Biggs' name is misspelled.

Comparing Biggs' two signatures, it appears that only one was placed by Biggs.  Plaintiff repeatedly asserted that the contract is irrelevant because the salvage claim arose before executing the contract.  That may be so, but its irregularities further evidence the bad-faith conduct here.

Plaintiff's bad faith overreaching drove this dispute from start to finish. Plaintiff made an extravagant and baseless demand against Defendant pre-suit.  When Defendant refused to pay, Plaintiff brought suit and alleged an array of falsities.  The parties then engaged in discovery, where Plaintiff provided more false statements.  Plaintiff proceeded to trial.  The facts at trial proved that this was a tow, not a salvage event.  Plaintiff's assertions of peril were proven incorrect repeatedly, but Plaintiff continued to double down.  This is a case where "a vessel owner refused to pay the exorbitant and unjustified demand of a salvor and was forced to go to trial."  *Reliable Salvage & Towing, Inc. v. Bivona*, 476 F. App'x 852, 855 (11th Cir. 2012). Accordingly, Defendants are entitled to recover their attorney's fees and costs.

## CONCLUSION

Plaintiff failed to establish marine peril and thus failed to establish entitlement to a salvage award.  Plaintiff also abandoned its Maritime Lien and Quantum Meruit claims.  Defendants established that Plaintiff engaged

in bad-faith litigation, entitling them to an award of attorney's fees and costs to be determined by the Court after entry of judgment.

Accordingly, it is now

**ORDERED:**

1. Defendants are entitled to judgment in their favor on the Second Amended Complaint (Doc. 11) and the Counterclaims (Doc. 12) to the extent that they are entitled to recover their attorney's fees and costs.

2. The Clerk is **DIRECTED** to enter judgment, terminate any pending deadlines, and close the case.

3. **On or before December 30, 2024**, Defendants may file a supplemental motion on the amount of attorney's fees.

**DONE** and **ORDERED** in Fort Myers, Florida on December 13, 2024.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record